# CHARLESTON.

### M. M. & D. D. BROWN v. WESTERN MARYLAND RY. CO.

Submitted October 17, 1922.   Decided October 24, 1922.

1.   CONTRACTS—*Contract Conditioned on Reduction to Writing Not Complete Until Condition Complied with; Complete Contract Not Invalid Because of Reference to Future Contract in Writing.*

   Where the parties to an agreement make its reduction to writing and signing a condition precedent to its completion, it will not be a contract until this is done, although all of the terms of the contract have been agreed upon.   But where the parties have assented to all the terms of the contract, which are fully understood in the same way by each of them, the mere reference in conjunction therewith to a future contract in writing will not negative the existence of a present contract.   (p. 118).

2.   SAME—*Agreement for Written Contract Binding.*

   A contract to make and execute a certain writing or agreement, the terms of which are mutually understood and agreed upon, is in all respects as valid and obligatory, where no statutory objection interposes, as the written contract itself would be if executed, and neither party is at liberty to refuse to perform, or to enter into the agreement as stipulated.   (p. 121).

3.   SAME—*Construction of Agreement to Make Binding Written Contract for Jury.*

   It is for the jury to determine whether agreements entered into by parties constitute a valid and binding contract only upon their subsequently being reduced to writing and executed by the parties, where the determination of such question depends upon conflicting evidence, or upon the interpretation to be placed upon the conduct of the parties at the time of entering into the agreement, or subsequent thereto.   (p. 121).

4.   SAME—*Binding Cotnract Not Rescinded Because Subsequent Negotiations for Modification of no Effect.*

   A valid binding contract between parties will not be rescinded because they subseuently enter into negotiations for a modification of it, which negotiations prove abortive, and of no effect.   (p. 121).

5.   SAME—*Agreement to Modify Contract Where One Party As-
      sumes no Obligations Void as Without .Consideration.*

    Where the parties to a contract seek to modify it by a sub-
    sequent agreement by which one of the parties assumes no ob-
    ligations, or releases nothing, the promises by the other are
    without consideration and the original agreement is not
    affected.  (p. 121).

Error to Circuit Court, Randolph County.

Suit by M. M. Brown and another against the Western
Maryland Railway Company.  Judgment for defendant, and
plaintiffs bring error.

*Reversed and remanded.*

*W. B. & E. L. Maxwell,* for plaintiffs in error.
*E. A. Bowers,* for defendant in error.

RITZ, JUDGE:

This suit was instituted for the purpose of recovering
damages for the breach of an alleged contract to construct
a side track for the plaintiffs.  Upon the trial of the case
the court directed the jury to return a verdict in favor of
the defendant, upon which verdict the judgment complained
of on this writ of error was rendered.

Prior to the 6th of April, 1912, the plaintiffs owned a saw-
mill in the city of Elkins.  They were also the owners of a
considerable body of timber situate about eight miles from
said city of Elkins.  It was their practice in the conduct of
their business to haul their logs from this timber tract at
Meadows Station to Elkins over the defendant company's
railway.  The plaintiffs had built a private railroad from the
defendant company's main line out into their timber tract,
and a switch connected this private logging railroad with the
defendant company's main line. The cars for the purpose of
hauling the logs were delivered by the defendant company
upon this private railroad of the plaintiffs, and taken by
them to the place in the woods where they were to be loaded
with logs, and after being loaded they were returned by the
plaintiffs to the defendant company's main line, where they

were taken by the defendant to the plaintiff's mill at Elkins, and there unloaded and cut into lumber. For this service the defendant company charged the plaintiffs $7.50 per car. On the 6th of April, 1912, the plaintiffs' mill at Elkins was destroyed by fire, and they had about determined not to relocate their mill at that point. In fact, it appears that they had acquired a site for the mill at Meadows Station, and had about determined to there erect the same. It appears that at Elkins they were very much cramped for ground upon which to store their manufactured product, as well as for siding facilities to be used in connection with loading the same upon cars for shipment. The fact that they had to pay $7.50 a car to get their logs to the mill after delivering them to the defendant company's line was also another serious handicap. If they located their mill at Meadows they would save this $7.50 per car, or a large part of it, for the reason that the freight rate from Meadows in one direction would be, perhaps, less, and certainly no more than from Elkins, and in the other direction not substantially more. It seems, however, that the Elkins Chamber of Commerce and other interests at Elkins were very anxious to have the plaintiffs' mill remain at that point. The defendant company appeared to be interested in having the mill erected there. With a view to securing this the interested parties took up with the plaintiffs the question of reconstructing their mill at Elkins instead of removing the same to Meadows. It seems that there were two other industries at Elkins, to-wit, the Elkins Pail & Lumber Company and the Elkins Refrigerator Company; that they were very anxious to have the plaintiffs' mill erected at Elkins, for the reason that their plants were contiguous to the plaintiffs' plant, and they received the material used by them direct from the plaintiffs' mill without any intervening shipment. This agitation resulted in negotiations being begun between the plaintiffs and the defendant company, which culminated in a meeting between the plaintiff, M. M. Brown, and the general manager of the defendant company at Elkins on the 17th of May, 1912, at which the plaintiffs contend a valid and binding

contract was entered into covering the matters involved in their negotiations. According to the plaintiffs, at this meeting the railroad company agreed that if plaintiffs would rebuild their mill at Elkins and ship all of the lumber manufactured thereat over the defendant company's lines, so long as it furnished them a freight rate as advantageous as any other railroad, and if the other two industries mentioned would ship at least seventy-five per cent of their freight over the defendant's lines under the same conditions, it, the defendant company, would reduce the charge for hauling the logs from Meadows to Elkins from $7.50 a car to $5.50 a car, and would permit the plaintiffs, during the time they were engaged in manufacturing lumber at their mill at Elkins, to use the strip of land on the south side of its tracks for the purpose of constructing docks and piling grounds, and a considerably larger strip on the north side for similar purposes, as well as permit them to pass under a bridge for the purpose of conveying the lumber from one side to the other; and in addition, would put in a siding on the south side of the tracks, and subsequently an extension of a siding on the north side of the track through the grounds to be used by the plaintiffs in piling their lumber, a distance of about eight hundred feet. This agreement, according to the plaintiffs, was finally consummated at that time, and the defendant company's general manager advised them to go on with the construction of their mill; that he had memoranda of all the matters agreed upon, and would subsequently reduce them to writing when the same could be executed by the parties. According to the plaintiffs, it was further agreed that the extension of the siding on the north side of the railway company's lines, a distance of about eight hundred feet, was not immediately desired, and would not be needed until they reached their spruce and hemlock lumber, and in view of this fact the defendant company's general manager advised them that whenever they did have use for this siding it would be constructed in accordance with the agreement; that he would prepare an agreement covering the same and send it to them which they could execute whenever they needed the siding.

In accordance with this contract the plaintiffs did rebuild their mill at Elkins on the old site and began the cutting of lumber thereat. They used the ground on both sides of the tracks for the purpose of piling their lumber thereon. They built their docks in accordance with the agreement and their tramroad extending across the defendant's right-of-way under the bridge, as provided in the contract. The railroad company permitted this to be done, and in addition thereto put in effect the rate of $5.50 a car for the logs being shipped from Meadows to Elkins. The short spur track which was to be put in on the south side of the railroad, it was afterward found, was impracticable, inasmuch as it could be extended only to hold about one car, and this would not be of material advantage to the plaintiffs, wherefore it was never put in, and never required. At the time none of these agreements were reduced to writing, but as before stated the defendant's general manager at the time he left the conference stated that he had memoranda of all the matters agreed upon, and would reduce them to writing subsequently. A short time thereafter the defendant company sent to the plaintiffs an agreement in writing covering the extension of the side track on the north side of the tracks, about eight hundred feet, through the land to be used by them as a piling ground. This was the siding which they would not need until they began to ship their spruce and hemlock lumber. Upon receipt of this contract, of which there were prepared five copies, the plaintiffs suggested that it was not in accordance with their agreement, inasmuch as it provided that the plaintiffs should pay switching charges, which, according to them, was not contemplated unless the cars were shifted from one point to another in Elkins, or to another railroad. Upon this being called to the attention of the defendant's general manager he advised them that was what the contract meant; that no shifting charges would be made on any cars shipped over defendant's line from this siding, but only on such cars as were switched from their siding to other points in the city of Elkins, and at the suggestion of the plaintiffs this construction of the contract was written in it, and it was then de-

livered to the plaintiffs. They did not execute the same at
that time for the reason, as stated by them, that they did not
then need the siding, and it was the understanding that they
would execute a formal contract for it when their need for it
arose. This contract provided that the plaintiffs furnish
cross ties for the extension of the siding and pay the esti-
mated cost of constructing the same, amounting to a little
more than eight hundred dollars. The plaintiffs continued to
run their mill and to use the piling grounds on both sides of
the tracks until the summer of 1914, when they were noti-
fied by a real estate agent of the defendant company that
they were trespassing upon the defendant's land by the use
thereof on the south side of the tracks. They called the at-
tention of this agent to the contract they had of May
1912, permitting them to make this use, and at the sugges-
tion of said agent entered into a contract in writing provid-
ing for the use of this ground upon the south side of the
track. In the summer of 1915 plaintiffs were ready to be-
gin shipping their spruce and hemlock lumber, and they
then called upon the defendant company to extend the siding
on the north side of the track the eight hundred feet through
their piling grounds, so that the lumber could be loaded di-
rectly into the cars. The management of the railway com-
pany had changed in the meantime and the then general
manager advised that he knew nothing about any such con-
tract or agreement, and could find no record of it in his
office. He was then furnished a copy of it by the plaintiffs,
unexecuted, and he then replied that inasmuch as they had
not executed it and required the construction of the siding up
to that time he assumed that they had abandoned that con-
tract, and he would prefer to take the matter up as new bus-
iness. The plaintiffs responded that they did not object to
doing this, provided it was promptly taken up and the sid-
ing furnished to them so that they could keep their mill
running. Upon this basis the defendant company's general
manager then made a proposition that he would put in a
siding a little different from that first contemplated, but still
running through plaintiffs' piling ground, but required, in

addition to the obligation devolving on the plaintiffs in the original contract, that they procure the dismissal of a suit pending against the railroad company by Brown & Hill, and the waiver of any claim by that firm against the railway company because of the matters involved in that suit. The senior member of the plaintiffs was the senior member of the firm of Brown & Hill. The plaintiffs immediately informed the defendant that they could not consider the proposition upon any such basis; that that was a separate and distinct matter belonging to another firm, and according to their contention the defendant company's general manager declined to give them the side track desired upon any other terms. About this time the plaintiffs were served with a notice from the defendant company advising them that they were trespassing upon the land on the north side of the tracks upon which they had large quantities of hemlock and spruce lumber then piled ready for shipment, and requiring them to at once remove this lumber from the defendant's land at that point, failing in which the defandant would have it removed at their expense and hold the same until the expense of removal was paid. The plaintiffs then brought a suit in equity seeking to enjoin the defendant company from interfering with their use of the piling ground aforesaid, and also seeking a mandatory injunction to compel the defendant company to extend the siding through their piling ground as provided by the contract of May, 1912. This bill was dismissed by the circuit court upon demurrer, but upon appeal to this Court the decree of dismissal was reversed, and the cause remanded for further proceedings. *Brown* v. *Western Maryland Ry. Co.*, 84 W. Va. 271. The plaintiffs claim that because of the extraordinary expense to which they were put in loading their lumber for shipment on account of the failure of the railroad company to extend this siding for them, they accepted an offer to sell out their plant for the sum of $150,000.00, much less than it would have been worth had they been granted the facilities to which they were entitled, and having no use for the siding after they made a sale of the plant the equity suit for the purpose of compelling its construction was dis-

continued, and this suit instituted for the purpose of recovering the damages sustained by the plaintiffs because of the failure of the defendant to construct this side track.

The defendant contends that the court below properly struck out the plaintiffs' evidence and directed a verdict in its favor, for the reason that it appears from the showing made by the plaintiffs that they never had any valid and binding contract requiring the defendant to construct this side track; that it was the understanding that in order that the arrangements made on the 17th of May, 1912, should constitute a valid and binding contract the same should be reduced to writing and signed by the parties; that before that their arrangements were only tentative and not mutually binding upon either of the parties; and that even though they are mistaken about this proposition, still that by the subsequent negotiations, on a new basis, the parties rescinded whatever contract they had in 1912, and not having come to any agreement upon a new basis, the plaintiffs are entitled to no relief.

It is very well established, of course, that where parties enter into negotiations and come to a conclusion, or a tentative conclusion, and it is understood that their agreements shall not be binding upon them until after the same have been reduced to the form of a writing and executed by the parties, there is no valid and binding contract until that has been done. But it is just as well established that where they have fully agreed upon all of the matters about which they are negotiating, and have fixed their reciprocal obligations and rights so that the same cannot thereafter be changed without mutual consent, there is a valid and binding contract, notwithstanding the parties may agree that these agreements and understandings shall be subsequently reduced to writing to be signed by the parties. *Western Roofing Tile Co.* v. *Jones,* 26 Ok. 209, 109 Pac. 225, 23 Am. & Eng. Anno. Cas. 127; *Sanders* v. *Pottlitzer Bros. Fruit Co.* 144 N. Y. 209, 43 Am. St. Rep. 757; *Drummond* v. *Crane,* 159 Mass. 577, 23 L. R. A. 707; *Rankin* v. *Mitchem,* 141 N. C. 277, 53 S. E. 854; *Jenkins & Reynolds Co.* v. *Alpena Portland*

*Cement Co.*, 147 Fed. 725; *Hardwood Package Co.* v. *Court-ney*, 253 Fed. 929. From these authorities it is very clear that a binding oral contract may be made between parties, though there is an understanding that it is to be subsequently reduced to writing, which writing is never completed, where it appears that all of the terms of the contract are fully understood and agreed to, and there is no agreement that their validity depends upon their being reduced to writing. And it seems as well established that, where the parties agree upon something to be done in the futrue, to be evidenced by a contract in writing to be signed at that time, and all ot the terms and conditions have been agreed upon, the failure of one of the parties to execute the agreement when the time arrives will give rise to an action for damages on behalf of the other contracting party. *Sanders* v. *Pottlitzer Bros. Fruit Co., supra.* In this case the plaintiffs admit that it was understood that the contract would be reduced to writing; M. M. Brown, the senior member of the firm, who had the negotiations, testifies that at the time they were concluded the defendant's general manager told him that they had agreed on everything and to go ahead with the construction of the mill, and from the notes that he had he would reduce their agreement to writing to be subsequently signed by the parties. There is nothing here that shows of itself that this was considered as a prerequisite to the existence of a contract. In fact the contrary appears, for the defendant's general manager told Brown to go ahead with the performance of plaintiff's part of the contract without waiting for a writing to be prepared and executed. This writing was never prepared or executed. According to the plaintiffs this contract provided that the siding, about which this litigation arises, should be extended whenever the plaintiffs' needs required it, and that at that time a written contract would be entered into covering that question. When the time arrived the defendant refused to perform upon its part, claiming that by not having theretofore procured the extension of the siding the plaintiffs had abandoned their rights. Of course, this is inconsistent with the contention of the plaintiffs, for

they say the contract which they entered into provided that they were not to execute the contract for the extension of this siding until they needed it, and that they did offer to execute it upon their part as soon as they did need it. This was in strict accordance with the terms of their original contract as they interpreted it. The defendant company insists that there are circumstances in the case which indicate that the parties never intended that the agreements entered into in May should be a valid and binding contract until they were reduced to writing and signed, and have instanced the fact; that when the plaintiffs' attention was called to the lumber piled by them on the south side of the defendant's tracks on the lands of the defendant, and were advised that this was without authority, the plaintiffs then entered into a contract under which they continued to use this land. This was more than two years after the plaintiffs began the use of the land, and it is explained by the plaintiffs, their explanation being that they preferred to enter into the contract presented to them rather than to have any contention about the matter, inasmuch as it was not substantially different from their agreements in the first instance. On the other hand, it is contended by the plaintiffs that practically all of the circumstances and acts done by the parties subsequent to May, 1912, indicate that there never was any intention that the validity of the contract should depend upon its being reduced to writing and signed. They say that they made use of the defendant's ground for piling their lumber on both sides of its tracks for at least two years without any objection, strictly in accordance with the agreement made in May, 1912; that they built their tramroad across the defendant's right-of-way under its bridge, in accordance with that agreement; that they reconstructed their mill at Elkins in accordance with that agreement; and that the defendant company put in effect the $5.50 rate for hauling their logs from Meadows to Elkins in lieu of the $7.50 rate theretofore existing, strictly in accordance with the agreement, and that the only thing which remained to be done to complete the agreement was the construction of this side track. Whether the agreements

of the parties entered into in May, 1912, were to be a valid and binding contract, notwithstanding they might never be reduced to writing, may in some degree depend on the interpretation to be put upon the conduct of the parties at the time and subsequently, and where it is necessary to resort to the conduct of the parties, or to the circumstances surrounding them at the time, in order to determine this question, then it is one for the jury, and not for the court. See authorities above cited. Placing the construction most favorable to the defendant upon the evidence introduced by the plaintiffs in this case, it cannot be said that the court could as matter of law hold that it was a prerequisite to a valid and binding contract that the same should be reduced to writing and be signed by the parties. To say the least of it, under the facts proven, and the acts shown to have been done by the parties subsequent to the contract in strict accordance with its terms, it would be a question for the jury whether the parties contemplated a formal writing, and the execution of it as a prerequisite to the validity of their undertakings.

The second proposition insisted upon by the defendant to defeat this cause of action is that even though the parties did enter into a valid and binding undertaking in May, 1912, they subsequently rescinded this in 1915, and this contention is based upon the fact that the plaintiffs agreed to negotiate in regard to the construction of the siding upon the basis that it was new business. It is insisted by the defendants that simply by entering into negotiations for the construction of the siding upon any other basis than that contemplated by the original contract the plaintiffs abandoned and rescinded the original contract. To this proposition we cannot agree. If the parties had entered upon subsequent negotiations, and had come to an agreement different from that which they had made originally, and which was intended to take the place of the original agreement, then, of course, the original agreement would be no longer binding, but the subsequent agreement would be the one upon which the parties must rely. Under the evidence in this case, however, they

never reached any conclusion in their subsequent negotiations. The defendant company proposed to put in the siding under conditions materially different from those provided in the original contract, and the plaintiffs rejected this proposition. Where parties have a valid and binding contract, of course, neither of them can lose the advantage which it gives him without some consideration, and to say that he could lose all of the benefit of his contract by simply negotiating for a change of it would be to deprive him of the benefits without any consideration whatever. Nor will the agreement of one of the parties to do what he is already obliged to do be a valid consideration for the other party to give up a substantial right. *Harris* v. *Murphy*, 119 N. C. 34, 56 Am. St. Rep. 656 and note at page 664; *Davis & Co.* v. *Morgan*, 117 Ga. 504, 43 S. E. 742, 97 Am. St. Rep. 171; *Shriner* v. *Craft*, 166 Ala. 146, 51 So. 884, 139 Am. St. Rep. 19; *Macfarland* v. *Heim* 127 Mo. 327, 48 Am. St. Rep. 629; *Spencer* v. *McLean*, 20 Ind. App. 626, 67 Am. St. Rep. 271; *Cole* v. *George*, 86 W. Va. 346. According to the evidence in this case the defendant, by the negotiations entered into in 1915, surrendered no right that it theretofore had, and gave no consideration whatever for the alleged surrender by the plaintiffs of their contract right to have this side track extended. The plaintiffs had fully performed all of the obligations of the contract on their part except the payment of the estimated cost of putting in the siding, which they were willing to advance at any time, and it cannot be said that simply by entering into negotiations with the defendant, which were entirely abortive, they lost this right under this contract without any consideration flowing to them therefor.

Our conclusion is that under the evidence submitted the court could not say as matter of law that it was a prerequisite to the validity of the original contract that it should be reduced to writing, or that it had been abrogated by the subsequent negotiations of the parties. It follows that the judgment complained of will be reversed, the verdict of the jury set aside, and the cause remanded for a new trial.

*Reversed and remanded.*