## POWER SERVICE CORPORATION v. JOSLIN.

### No. 11992.

United States Court of Appeals
Ninth Circuit.

June 21, 1949.

Rehearing Denied July 25, 1949.

Lancie L. Watts, Kansas City, Missouri, for appellant.

Frank J. Hennessy, U. S. Attorney, Rudolph J. Scholz, Asst. U. S. Attorney, San Francisco, Cal., for appellee.

Before MATHEWS, HEALY and POPE, Circuit Judges.

POPE, Circuit Judge.

Appellant, a Minnesota corporation, sued appellee, a citizen of California, upon a contract whereby appellant, as subcontractor, undertook to erect and install three boilers in a government ordnance plant in Kansas where appellee was himself subcontractor for installation of plumbing, heating and ventilating facilities. Under the contract appellant, to whom we shall refer as the Corporation, was to perform all necessary work as called for by the plans and specifications, all within a period of 120 days. Joslin, the appellee, was to furnish all materials and equipment required. The Corporation claimed damages on account of Joslin's alleged breach of contract in failing to furnish materials required on time, with resultant loss to the Corporation. The trial court, sitting without a jury, awarded the Corporation damages in the amount of $3753.15. On this appeal it asserts that the damages thus awarded are inadequate and that the court failed to apply the proper measure of damages, contending that under the evidence it should have recovered $34,343.00. These damages, it asserts, were suffered because completion of the job required 39 days extra time, due to the claimed default of Joslin.

Joslin asserts that if the contract were as alleged by the Corporation, the damages could be no more than nominal, but contends that the terms of the contract were such that there was no breach of its terms, and no right to recover damages.

We are therefore confronted, initially, with Joslin's claim that the contract by its terms does not permit recovery of damages for delay in furnishing materials. If his position with respect to the provisions of the contract is sound, a consideration of the question raised by the Corporation with respect to the measure of damages will be unnecessary.

The specifications which formed a part of the proposed contract upon which the Corporation was the low bidder contained a paragraph numbered 1-05(c) which provided that: "In case time for completion of the work is increased due to any of the causes specified herein it is distinctly understood and agreed that the subconstructor [the Corporation] will accept the additional time in which to complete his subcontract in full satisfaction of any delays encountered, and the Constructor [Joslin] will not be liable for any costs or expenses incurred by the subconstructor as a result of the increased time for completion of the subcontract."

The same specifications required the Corporation to commence work under the subcontract within five calendar days after the date of receipt by it of notice to proceed and thereafter to prosecute the work to completion within 120 days. The bid form executed by the Corporation contained its agreement to execute the form of contract, which, with the specifications had been prescribed by the War Department, within two days after such forms were presented for signature. The bids, which were for a lump sum, were opened July 8, 1944 and the Corporation was the low bidder. The bid was received at Joslin's Kansas City, Missouri, office, and was there accepted on July 11, 1944. Notice to proceed with the work was given the same day by letter which the Corporation received July 13, 1944.

Joslin claims that the moment the bid was accepted and notice to proceed given, the rights of the parties had become fixed, and a complete contract made, and that the paragraph of the specifications above quoted, excluded any right to damages for delay. The Corporation claims that this provision was eliminated or modified by the later insertion of a rider on the signature page of the formal contract. That came about in the following manner.

By letter dated July 14, 1944 the general contractor for the Sunflower Ordnance Works (generally referred to in the record as the Architect-Engineer-Manager) transmitted to the Corporation a written contract in the form specified in the call for bids with request that it be executed and returned. But, although it did promptly enter upon the performance of the work, the Corporation declined to execute the formal contract pending its continued efforts to persuade Joslin to attach a rider to the subcontract or to make supplemental

commitments by letter relating to the matter of reimbursing the Corporation for increased costs occasioned by delay in furnishing certain materials.

This attitude on the part of the Corporation arose out of the fact that shortly after it had been awarded the subcontract it discovered that some portion of the materials for the three boilers, which are referred to in the record as "water wall tubes and headers" [1] were not on hand or presently available for installation.

The work called for by the contract had originally been arranged for in 1942 when the general contract for the erection of the ordnance plant had been made. The plant was to have three power houses, but when two had been completed, work was stopped on the third. Subsequently, and at the time the bids here referred to were called for, it had been decided to complete the third power house and the subcontract, upon which the corporation bid, was for the erection of the three boilers in this third power house, designated as "Power House No. 1". When the work was suspended, materials for the three boilers had been collected and stored on or near the site. One paragraph of the specifications recited: "Nearly all of the materials required for the work has been stored in power house No. 1 or in warehouses adjacent thereto." The specifications further required the successful bidder, immediately after starting work, to compile a list of materials required, check this against the quantities on hand, and report shortages to Joslin.

At the time the bid was presented, neither the Corporation nor Joslin knew what, if any, shortages in this material existed. After the Corporation received the notice to proceed, it did not make a complete list of the materials on hand, but on July 26, 1944 wrote to Joslin as follows: "In connection with our subcontract for complete erection of boilers in Power House No. 1, Sunflower Ordnance Works, Johnson County, Kansas, we wish to advise of a major shortage of materials which will delay the progress of our work beyond our contract schedule.

"This material consists of water-wall tubes for all three of the boilers which we are to erect. In order for us to complete our work in the one hundred twenty day period required, it will be necessary for us to have delivered to the job sufficient tubes for one boiler by August 1, 1944; sufficient tubes for a second boiler by August 8th, 1944, and the balance of the tubes for the third boiler by August 15th, 1944."

On August 8, 1944 the Corporation requested permission to append a proviso on the signature sheet of the formal contract relating to reimbursement of such increased cost as might be occasioned by non-availability of tubes. This was not acceptable to Joslin. Again on August 22 the Corporation requested Joslin to write it a letter in effect acknowledging the Corporation's right to present a claim for increased costs resulting from delay in the delivery of the materials. This request also was declined by Joslin, but on September 11, 1944 the subcontract forms were signed by the Corporation and at the same time there was appended to the signature page and initialed by both the parties to the contract and by the general contractor and the War Department's Contracting Officer, the following sentence: "This contract is signed and executed by the Power Service Corporation without any intent on the part of the corporation to abandon or waive any right which it may have to submit, prove, and collect damages by reason of the late delivery of materials notwithstanding the provisions of Par. 1-05 of the specifications." [2] It is this sentence upon which the Corporation principally relies. Joslin claims first, that its language was such that it did not purport to increase his obligations under the contract, or to do away with or obviate the effect of specification 1-05(e) reciting that Joslin should not be liable for damages for delay; and second, that even if it did purport so to provide, that when it

---

[1] The claim is confined to delay in respect to these particular materials. No complaint is made concerning delivery of any other items.

[2] When the question of attaching a rider was presented to him Joslin advised his project manager that the contract must be signed "as is". The manager testified that he agreed to the added sentence after obtaining advice from his attorney that it would not alter the original specifications.

was inserted the parties had already become bound according to the original specifications, and that therefore the insertion of the quoted language was without consideration and not binding on Joslin.

Notwithstanding the actual signing of the subcontract was thus delayed, the Corporation began the work of construction very promptly after receipt of its notice to proceed. Its engineer testified that the work was begun on the 13th or 14th of July, 1944. It appears that there was a full supply of materials for at least one boiler, and sufficient to start with the others, and crews were at once put to work. It was required by the specifications to prepare and submit to Joslin a proposed work schedule within seven days after notice to proceed. This was done within the time required. On the 13th or 14th of July the Corporation began the compilation of its "list of materials" required. Its chief engineer testified that the list of required materials was checked against the material found on the site and shortages noted, and on the basis of such notations, requisitions for materials required were forwarded to Joslin. The first requisition was dated July 26, 1944, but no complete list of requirements for water-wall or header tubes appears to have been furnished until requisition No. 26 on August 19, 1944. This purported to cover water-wall tubes for all three boilers and contained the following recitals. "As a matter of record, we wish to confirm our verbal advice on the shortage of water wall tubes for boilers #1, #2 and #3. The tubes were found to be short on July 14, 1944 and the matter discussed with Major Matthews, Capt. Overesch, Mr. D. C. Smith of Lozier, Broderick & Gordon, and Mr. Ralph J. Jung of Cory, Joslin and Macnsons."[3]

It thus appears that immediately after notice to proceed was given, and before the formal contract was signed, the Corporation, Joslin, and the prime contractor all proceeded as if the subcontract were in full effect. By the time the rider was attached 40 percent of the work was completed.

While the language of the rider itself seems to refer only to the Corporation's intent not to waive "any right which it may have", the district judge construed it to mean that Joslin undertook to pay damages for late delivery of materials. Its legal effectiveness to dispense with the provisions of paragraph 1-05(e) of the specifications, denying such damages, can only be sustained if it be held that no contract between the parties existed before the rider was attached, for if, as Joslin claims the contract became effective when the bid was accepted, the added sentence could not alter the effect of the original specifications, for at that time there was no new consideration to support it.[4]

---

[3] On August 15, 1944 the general contractor wrote to the Corporation as follows: "Receipt is acknowledged of your requisitions numbered 1 to 13, the latter being dated August 11, 1944. We assume that the above requisitions represent all of the shortages of material required for completion of your contract on Power House No. 1, and that same are the result of a complete inventory made by you in accordance with Paragraph 5-04(b) of your contract." The Corporation replied that it was "endeavoring to complete this requisition as rapidly as possible." There followed the general contractor's letter of August 19, 1944, stating that: "* * * it was known that some materials have been borrowed from Power House No. 1 inventory by the Hercules Maintenance and Operating Departments, and others, but there was no definite record of just what materials had been taken. That was one reason for requiring a complete field check of the materials and equipment inventory by the subcontractor."

[4] Volume 1 Williston on Contracts, Rev. Ed. Sec. 130: "Especially common is the situation where a builder or contractor undertakes work in return for a promised price and afterwards finding the contract unprofitable, refuses to fulfill his agreement but is induced to fulfill it by the promise of added compensation. On principle the second agreement is invalid for the performance by the recalcitrant contractor is no legal detriment to him whether actually given or promised, since, at the time the second agreement was entered into, he was already bound to do the work; nor is the performance under the second agreement a legal benefit to the promisor since he was already entitled to have the work done."

For a decision relating to a construction contract in the State where this contract was made see Lingenfelder v. Wainwright Brewery Co., 103 Mo. 578, 15 S.

■ Ordinarily though parties contemplate the ultimate execution of a more formal writing, the acceptance of a bid or offer results in a binding contract when none of the material terms remain unsettled or require future determination. It is so held in Missouri where the bid was made and accepted.[5]

What these parties did in respect to performing the work would indicate that such must have been their intention and understanding here. Joslin said so expressly.[6] It is difficult to believe that the Corporation, in proceeding as it did to carry on performance, to expend substantial sums, and to employ extensive crews of men during this period from July 13 to September 11, 1944, intended to do so in the absence of any existing contract.

■■ Nor does paragraph 1-29 of the specifications change this result. It reads: "The subcontract shall be subject to the written approval of the Architect-Engineer-Manager [the general contractor] and the Contracting Officer, and shall not be binding until so approved." The contract had the prior written approval of the Architect-Engineer-Manager for the general contractor issued the written notice to proceed and mailed the formal contract to the Corporation with a request that it be executed. As for the Contracting Officer, although his signature, with that of the Architect-Engineer-Manager, was not appended to the formal contract until September 11, 1944, yet the record shows that he was fully informed of all that transpired, and received copies of most of the correspondence that took place during the period from July 13, 1944 on. The clause requiring his written approval was one inserted solely for the protection of the government, which clearly had the right to, and did waive it.[7] Under these circumstances the Corporation is hardly in a position to claim that this provision, which all parties ignored, operated to postpone its obligation under its bid.[7a]

---

W. 844. For a statement of the same rule by this Court see Alaska Packers Ass'n v. Domenico, 9 Cir., 117 F. 99.

[5] Priest v. Oehler, 328 Mo. 590, 41 S.W. 2d 783; Hudson v. Rodgers, 121 Mo.App. 168, 98 S.W. 778. The rule is stated in 1 Williston, Contracts, Rev.Ed. Sec. 28 as follows: "Where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, did not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed."

It has frequently been applied to the acceptance of bids on construction contracts. Girard Insurance Co. v. Cooper, 162 U.S. 529, 543, 16 S.Ct. 879, 40 L.Ed. 1062; Lehigh Structural Steel Co. v. Great Lakes Const. Co., 2 Cir., 72 F.2d 229; Duggan v. Matthew Cummings Co.; 277 Mass. 445, 178 N.E. 825; Friedman v. Schleuter, 105 Ark. 580, 151 S.W. 696; Middleton v. Emporia, 106 Kan. 107, 186 P. 981; Reynolds & Maginn v. Omaha General Iron Works, 105 Neb. 361, 180 N.W. 584; Diskin v. Herter, 73 App.Div. 453, 77 N.Y.S. 300, affirmed 175 N.Y. 480, 67 N.E. 1081; Billings v. Wilby, 175 N.C. 571, 96 S.E. 50; Highland County Com'rs v. Rhoades, 26 Ohio St. 411; Western Roofing Tile Co. v. Jones, 26 Okl. 209, 109 P. 225, Ann.Cas. 1912B, 127; Agostini v. Consolvo, 154 Va. 203, 153 S.E. 676; Brown v. Western Maryland R. Co., 92 W.Va. 111, 114 S.E. 457; Jungdorf v. Little Rice, 156 Wis. 466, 145 N.W. 1092.

[6] On August 31, 1944 Joslin, in replying to the corporation's request for a letter concerning the latter's possible claim for reimbursement of loss, stated: "The undersigned calls your attention to your acceptance of all of the terms and conditions of the specifications contained in your offer, and in the acknowledged notice of award and notice to proceed, and further calls your attention to the specific acceptance of the conditions of paragraph 1-05 of the specifications as the same appears on page 5 of your offer. The terms and conditions thus accepted can not be changed now. The contract, for all practical purposes, is in full force and effect."

[7] For a case involving waiver of an express requirement of a written notice, see Continental Casualty Co. v. Schaefer, 9 Cir., 173 F.2d 5.

While the contract also called for a performance bond which presumably was not executed until September 11, 1944, this requirement was for the protection of Joslin who waived it by permitting the work to proceed.

[7a] Cf. Paige v. Fullerton Woolen Co., 27 Vt. 485; Walton v. Mather, 16 Misc. 546, 38 N.Y.S. 782; Vicksburg Water-

While parties to an agreement may make its reduction to a formal writing and the execution of such writing a condition precedent to its effectiveness notwithstanding all the terms have been agreed upon,[8] we think that such was not the case here. It is our view that the terms of the contract became fixed and the parties bound when the bid was accepted and notice to proceed issued, that the contract thus made contained the express provision against recovery of damages for delay stated in paragraph 1-05(e) of the specifications, and that any attempt to alter that specification by the addition of the rider on September 11, 1944 was ineffective for want of any consideration therefor. We hold that insofar as claim is made for damages for delay, the contract expressly prohibits the recovery appellant seeks.

Nor can the corporation avoid the effect of paragraph 1-05(e) by asserting liability based upon a claim of misrepresentation of fact. Some language in the complaint, and in the record, suggests that the corporation complains not merely of delays in delivery of the tubes, but that they "were not in fact in storage as represented to plaintiff."[9] Evidently this is a suggestion that Joslin warranted that the tubes were on hand. The specifications themselves disprove any such claim. Not only does the statement quoted above, that "nearly all of the ma-terials required for the work has been stored" suggest a probable shortage, but that such shortages were definitely contemplated and the contract made accordingly is shown by paragraph 5-04(b) of the specifications requiring the Corporation to ascertain and report the shortages.[10] Total materials used in the contract had a value of $1,145,000. The value of the missing tubes was $14,208.00, approximately one and two-tenths per cent. In view of the specifications we cannot find any basis for a claim of breach of contract in the fact that the words "nearly all" were used in describing the location of the materials.

We must also consider the count of the complaint which seeks reformation of the contract because of an asserted mutual mistake of the parties. In Count 2 the Corporation sought to have the contract reformed by inserting a paragraph to the effect that in case of delay caused by failure to deliver materials at the times required, "the Constructor agrees to pay to the Subconstructor such damages as it may suffer by reason of such delay."

Since the trial court found that the rider attached to the contract effectively created such an obligation, it found it unnecessary to consider the question of reformation. As we find the contract expressly excludes liability for such damages, we must consider

works Co. v. Guffy Petroleum Co., 86 Miss. 60, 38 So. 302; American Security & Trust Co. v. Walker, 23 App.D.C. 583.

[8] Green v. Cole, 103 Mo. 70, 76, 15 S. W. 317, 318; Priest v. Oehler, supra note 5. See notes 122 A.L.R. 1217, 165 A.L.R. 756.

[9] Par. 8 of Count 1. Prior to suit the corporation appears to have been in some doubt as to the nature of its claim. February 21, 1945, it made a written claim to Joslin stating: "Because of this delay in receiving these materials, we were unable to make the progress which we would otherwise have been able to make." June 30 thereafter it withdrew that claim and presented one based upon "misleading representation and inconsistencies in the specifications and contract." After referring to the specification stating that "nearly all" of the materials required were on hand, the claim stated: "We maintain that nearly all of the materials required for the work were not stored in Power House #1, or in warehouses adjacent thereto."

[10] Par. 5-04(b) is as follows: "Immediately after starting work under the Subcontract the Subconstructor shall prepare a 'list of materials' including accessories and equipment required, and shall check this list against the materials, accessories and equipment stored in or adjacent to the Power House in order that shortages may be immediately determined. Such shortages will then be reported to the Constructor for use in obtaining the balance of materials required for the completed work. Such an inventory will be kept current by the Subconstructor during the progress of the work and the subconstructor will be held responsible for advising the Constructor of his requirements sufficiently in advance of the time such items will be required to enable procurement without delaying progress."

whether the corporation might nevertheless be entitled to a reformation as prayed.

· The only mistake claimed was as to whether "nearly all" the materials were on the site. The Corporation asserted in its claim to Joslin of June 30, 1945: "We maintain that nearly all of the materials required for the work were not stored. * * * This paragraph 1-05 (calling for completion in 120 days), coupled with paragraph 5-04 (referring to 'nearly all' of the materials, etc.) is seriously misleading to the bidder, and when submitting his proposal the bidder rightly assumed conditions that did not exist, and as a consequence he bid a lower figure than he would have had the true facts been available to him."

██ We have previously indicated our disagreement with any assertion that the Corporation rightly assumed that the shortages were less than they actually were. But assuming a mistake existed, and that both parties made it, it is not such a mistake as warrants reformation. There was no mistake as to the language of the contract and the specifications. Nothing intended to be inserted was omitted by mistake. The mistake, if any, related to how much of the materials was on hand. Such a situation does not warrant reformation.[11]

What we have said makes it unnecessary to consider whether the lower court correctly computed the period of delay, or the extent of the loss.[12]

If the Corporation were misled to the extent it claims to have been with respect to the shortages, and had then, promptly upon discovering the situation, asked to withdraw its bid, it might possibly have had a meritorious claim for rescission on account of mistake.[13] It chose rather to cling to its position as low bidder, all others having been eliminated, and to endeavor to persuade either Joslin, or the general contractor, or the government, to increase its compensation. Its complaint that had it known the amount of the shortages it would have made a larger bid, suggests that had it done so it might not have obtained the contract. When it elected to proceed with the work it did so under the terms of its own bid which by reference incorporated the specifications which foreclosed claims for damages for delay. The persons to whom it made application for additional compensation found its claim without merit, as do we.

██ Although the Corporation has recovered damages to which it was not entitled, since there is no cross appeal the judgment must be affirmed.

---

[11] Russell v. Shell Petroleum Corporation, 10 Cir., 66 F.2d 864, 867: "To justify reformation on the ground of mistake, the mistake must have been made in the drawing of the instrument and not in the making of the contract which it evidences. Robinson v. Korns, 250 Mo. 663, 665, 157 S.W. 790; Curtis v. Albee, 167 N.Y. 360, 60 N.E. 660. A mistake as to the existing situation, which leads either one or both of the parties to enter into a contract which they would not have entered into had they been apprised of the actual facts, will not justify reformation. It is not what the parties would have intended if they had known better, · but what did they intend at the time, informed as they were.

"Williston on Contracts, Vol. 3, Sec. 1549, states the rule as follows: 'If, because of mistake as to an antecedent or existing situation, the parties make a written instrument which they might not have made, except for the mistake, the court cannot reform the writing into one which it thinks they would have made, but in fact never agreed to make'."

[12] The case was tried upon the theory that the Corporation's letter of July 26, 1944, stating generally that a shortage existed and that sufficient tubes must be on hand at stated times, was sufficient to put Joslin in default. Since less than a third of the 714 tubes required were missing, and were of different sizes, separately numbered, we think that the Corporation did not comply with specification 5-04(b) by thus attempting to shift to Joslin its own task of listing the shortages. Since a specific requisition was not made until August 19, 1944, the portion of the delay chargeable to Joslin may have been even less than that found by the lower court.

[13] Cf. Nordyke & Marmon Co. v. Kohler, 155 Mo. 643, 56 S.W. 287, 78 Am.St. Rep. 600; Saline County v. Thorp, 337 Mo. 1140, 88 S.W.2d 183.