UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 11-1398

CABOT OIL & GAS CORPORATION, a foreign corporation,

Plaintiff - Appellant,

v.

DAUGHERTY PETROLEUM, INCORPORATED, a Kentucky corporation,

Defendant - Appellee.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Robert C. Chambers, District Judge. (3:09-cv-00955)

Argued: March 23, 2012                    Decided: May 3, 2012

Before GREGORY, KEENAN, and FLOYD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Timothy Minor Miller, ROBINSON & MCELWEE, PLLC, Charleston, West Virginia, for Appellant. Ramonda C. Lyons, LEWIS, GLASSER, CASEY & ROLLINS, PLLC, Charleston, West Virginia, for Appellee. **ON BRIEF:** Benjamin W. Price, ROBINSON & MCELWEE, PLLC, Charleston, West Virginia, for Appellant. Richard L. Gottlieb, LEWIS, GLASSER, CASEY & ROLLINS, PLLC, Charleston, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case involves a breach of contract claim asserted by Cabot Oil & Gas Corporation (Cabot Oil) against Daugherty Petroleum, Inc. According to Cabot Oil, the two parties formed a binding contract in which Cabot Oil agreed to sell oil and gas leases to Daugherty Petroleum. Cabot Oil contends that Daugherty Petroleum breached this agreement by failing to complete the purchase. The district court granted summary judgment in Daugherty Petroleum's favor on the ground that there was no binding agreement between the parties. Cabot Oil now appeals. For the following reasons, we affirm.

I.

Cabot Oil is a Delaware corporation authorized to do business in West Virginia. On July 31, 2008, it issued a solicitation for bids for the purchase of oil and gas leases located across three counties in West Virginia. Daugherty Petroleum, a Kentucky corporation, was one of the companies to receive the solicitation.

In the solicitation letter, Cabot Oil stated that the leases covered approximately 15,367 gross acres and 15,085 net acres. Included with the letter were a map and schedule of the leases, but Cabot Oil disclaimed making any representations as to their accuracy or completeness. The solicitation letter

2

invited recipients to submit a "preliminary bid or proposal" and provided that "those submitting such proposals, if any, will be notified for further discussion and negotiation."

Daugherty Petroleum responded by letter on August 15, 2008. Throughout its letter, Daugherty Petroleum characterized its response as a "bid" or an "offer." It accordingly proposed a purchase price of $175 per net acre and a 2% overriding royalty interest for the leases. Daugherty Petroleum noted that it anticipated being able to close the transaction within seventy-five days of Cabot Oil's acceptance.

Daugherty Petroleum emphasized, however, that its bid was "contingent and conditioned" on a number of terms. One involved the form of consideration, which Daugherty Petroleum provided would likely involve payment of cash by wire transfer at the closing. Another condition entailed a due-diligence requirement that would allow Daugherty Petroleum to conduct appropriate title searches and that further required Cabot Oil to provide Daugherty Petroleum access to all documents in its possession relating to the lease properties and rights of access to the lease properties. A third condition required Cabot Oil to agree to take the leases off the market for sixty days to allow Daugherty Petroleum to conduct due diligence. Daugherty Petroleum specified it would not conduct due diligence unless Cabot Oil agreed to such an exclusivity period. Finally,

3

Daugherty Petroleum provided that while it was conducting due diligence the parties were to "negotiate the terms and conditions of an asset purchase agreement."

Weeks passed without Cabot Oil responding to Daugherty Petroleum's letter. During this time, representatives from the two companies exchanged phone calls. At one point, Tom Liberatore from Cabot Oil instructed Jeff Keim, his coworker, to hold off William Barr of Daugherty Petroleum so that Liberatore could consult with Cabot Oil's officers about whether they wanted to pursue a deal.

On October 6, 2008, Cabot Oil sent Daugherty Petroleum a letter in which it accepted Daugherty Petroleum's offered purchase price and noted that Daugherty Petroleum's proposed cash settlement was acceptable as well. Cabot Oil stated that it preferred to move directly into negotiating a purchase and sale agreement, which would provide Daugherty Petroleum an opportunity to conduct due diligence. Cabot Oil concluded by informing Daugherty Petroleum that it would begin preparation of a purchase and sale agreement.

Cabot Oil's letter omitted any reference to Daugherty Petroleum's condition requiring a sixty-day exclusivity period. Cabot Oil insists, however, that after it sent its letter it took the leases off the market and declined other offers to purchase them. Yet the record gives no indication that Cabot

4

Oil notified Daugherty Petroleum it had done so, and Daugherty Petroleum maintains it first learned that Cabot Oil had removed the leases from the market when Cabot Oil filed its complaint.

Daugherty Petroleum failed to respond to Cabot Oil's October 6, 2008, letter, prompting Cabot Oil to send an e-mail on November 13, 2008, asking how it wished to proceed. Daugherty Petroleum still did not respond. Six days later, Cabot Oil sent Daugherty Petroleum a follow-up letter. In it, Cabot Oil asserted that in its October 6, 2008, letter it accepted Daugherty Petroleum's offer to purchase the leases. It also discussed unreturned phone calls it had made to Daugherty Petroleum. The letter concluded by threatening to take legal action if necessary and requesting that Daugherty Petroleum contact it to "consummate [a] purchase and sale and avoid the necessity of a legal proceeding."

Upon receipt of this latest letter, Barr responded via e-mail on behalf of Daugherty Petroleum. He began by stating that he had been traveling for three weeks and just received Cabot Oil's messages. He noted that Daugherty Petroleum had conditioned its offer on the execution of a mutually agreeable purchase and sale agreement and the successful completion of due diligence. He further stated that he was awaiting a proposed agreement and that due diligence would not begin until the parties successfully negotiated such an agreement. During

5

Barr's subsequent deposition, however, he testified that by the time he sent this e-mail he did not believe the parties would be able to successfully negotiate a purchase and sale agreement because of the prevailing market conditions. He admitted that he did not convey this belief to Cabot Oil, explaining that he was agitated with the aggressive, threatening nature of Cabot Oil's previous letter.

On November 24, 2008, Cabot Oil sent Daugherty Petroleum a proposed purchase and sale agreement (the Proposed Agreement) via e-mail. The Proposed Agreement spanned twelve pages. It included terms that differed from Daugherty Petroleum's August 15, 2008, letter. For instance, whereas Daugherty Petroleum provided that it would likely pay with cash by wire transfer at closing, the Proposed Agreement contained a provision requiring that Daugherty Petroleum pay 25% of the purchase price upon execution of the agreement and the balance at closing. The Proposed Agreement also contained terms not included or contemplated in Daugherty Petroleum's August 15, 2008, letter, such as terms providing for specific remedies upon certain events of termination and various provisions relating to warranties and representations.

Cabot Oil followed up on multiple occasions in December 2008 and January 2009 to determine how Daugherty Petroleum's review of the Proposed Agreement was proceeding. Daugherty

6

Petroleum did not respond to Cabot Oil's inquiries or the Proposed Agreement. Nor did Daugherty Petroleum notify Cabot Oil that it did not intend to go through with the purchase of the leases.

In July 2009, Cabot Oil filed a complaint in the Circuit Court of Putnam County, West Virginia. In the complaint, Cabot Oil asserted a breach of contract claim against Daugherty Petroleum and requested either specific performance or damages in the amount of no less than $2,564,560. Daugherty Petroleum subsequently removed the case to the Southern District of West Virginia, invoking the district court's diversity jurisdiction.

Thereafter the parties filed cross-motions for summary judgment. Cabot Oil's motion for partial summary judgment asserted that no genuine issues of material fact existed concerning Daugherty Petroleum's liability for breach of contract and that Cabot Oil was entitled to judgment as a matter of law as to liability. Daugherty Petroleum, in its motion for summary judgment, contended that the undisputed facts demonstrated that no binding contract existed between the parties and it was entitled to judgment as a matter of law.

On March 23, 2011, the district court granted Daugherty Petroleum's motion for summary judgment and denied Cabot Oil's motion for partial summary judgment. The court determined that Cabot Oil and Daugherty Petroleum's correspondence did not

7

create a binding agreement, but instead constituted preliminary negotiations. In so holding, the court emphasized the parties' consistent mutual recognition of their intent to negotiate and execute a purchase and sale agreement to consummate any agreement but their failure to do so. Alternatively, the court concluded that there was no meeting of the minds between Cabot Oil and Daugherty Petroleum because Cabot Oil's October 6, 2008, letter and the Proposed Agreement contained terms different from Daugherty Petroleum's August 15, 2008, letter. Cabot Oil now appeals the district court's order.

## II.

We review de novo the district court's order granting summary judgment. See Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" Id. (quoting Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899 (4th Cir. 2003)). Inasmuch as jurisdiction in this case rests on the parties' diversity of citizenship, we apply the substantive law of West Virginia. See Moore Bros. Co. v. Brown & Root, Inc., 207 F.3d 717, 722 (4th Cir. 2000).

8

III.

A.

The fundamental elements of a binding, enforceable contract are "competent parties, legal subject-matter, valuable consideration[,] and mutual assent." Eurenergy Res. Corp. v. S & A Prop. Research, LLC, 720 S.E.2d 163, 168 (W. Va. 2011) (quoting Virginian Exp. Coal Co. v. Rowland Land Co., 131 S.E. 253, 254 (W. Va. 1926)) (internal quotation marks omitted). Mutuality of assent, in turn, generally requires an offer by one party and acceptance by the other. See Ways v. Imation Enters. Corp., 589 S.E.2d 36, 44 (W. Va. 2003). Offer and acceptance may be manifested through "word, act[,] or conduct that evince[s] the intention of the parties to contract." Id. (quoting Bailey v. Sewell Coal Co., 437 S.E.2d 448, 450–51 (W. Va. 1993)) (internal quotation marks omitted). And a meeting of the minds, which is a sine qua non of enforceable contracts, Sprout v. Bd. of Educ., 599 S.E.2d 764, 768 (W. Va. 2004), "may be shown by direct evidence of an actual agreement or by indirect evidence through facts from which an agreement may be implied," Ways, 589 S.E.2d at 44 (quoting Bailey, 437 S.E.2d at 451) (internal quotation marks omitted).

Parties may form binding contracts through correspondence. Sprout, 599 S.E.2d at 768. Yet courts must be careful not to construe correspondence as constituting a binding agreement if

9

the parties intended for it to serve merely as preliminary negotiations. Id. If the correspondence reflects that the parties intended to reduce an agreement to a formal written contract, a presumption arises under West Virginia law that the correspondence does not constitute a binding contract, but instead only preliminary negotiations. Blair v. Dickinson, 54 S.E.2d 828, 844 (W. Va. 1949); see also Sprout, 599 S.E.2d at 768 (recognizing with approval this presumption). Strong evidence is necessary to rebut this presumption. Sprout, 599 S.E.2d at 768; Blair, 54 S.E.2d at 844.

In considering whether a party has rebutted this presumption, the overarching goal is to discern whether the parties intended for a final written document to be merely a "convenient memorial" of their agreement or the "consummation of the negotiation." Blair, 54 S.E.2d at 844 (quoting Elkhorn-Hazard Coal Co. v. Ky. River Coal Corp., 20 F.2d 67, 70 (6th Cir. 1927)) (internal quotation marks omitted). The Supreme Court of West Virginia has recognized six factors to guide courts in making this determination: 1) "whether the contract is of that class . . . usually found to be in writing"; 2) "whether it is of such nature as to need a formal writing for its full expression"; 3) "whether it has few or many details"; 4) "whether the amount involved is large or small"; 5) "whether it is a common or unusual contract"; and 6) "whether the

10

negotiations themselves indicate that a written draft is contemplated as a final conclusion of the negotiations." Id. (quoting Elkhorn-Hazard, 20 F.2d at 70) (internal quotation marks omitted).

Moreover, "[i]f a written draft is proposed, suggested or referred to, during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract." Id. (quoting Elkhorn-Hazard, 20 F.2d at 70) (internal quotation marks omitted). And if "the parties to an agreement make its reduction to writing and signing a condition precedent to its completion, it will not be a contract until this is done, although all of the terms of the contract have been agreed upon." Id. at 843 (quoting Brown v. W. Md. Ry. Co., 114 S.E. 457, 457 (W. Va. 1922)) (internal quotation marks omitted).

B.

We begin by recognizing that from the start the parties manifested their intention to reduce any agreement into a final purchase and sale agreement. Daugherty Petroleum's August 15, 2008, letter proposing a purchase price made the negotiation of such an agreement a condition to its bid. Likewise, Cabot Oil's purported acceptance of Daugherty Petroleum's proposed purchase price reflected an understanding that the parties needed to

11

negotiate a purchase and sale agreement. Barr's response to Cabot Oil's follow-up e-mail and letter again emphasized that Daugherty Petroleum conditioned its offer on the execution of a mutually agreeable purchase and sale agreement. Most emblematic of the parties' mutual understanding that they would negotiate a formal contract, however, is the Proposed Agreement that Cabot Oil composed and sent to Daugherty Petroleum. Hence, because the parties manifested their mutual intention to memorialize any agreement in a formal written contract, we begin with the presumption that their correspondence did not create a binding agreement in the absence of such a formal contract.

Using the factors recognized by the Supreme Court of West Virginia, we next conclude that Cabot Oil has not offered strong evidence to overcome this presumption. Even accepting as true Cabot Oil's suggestion that these types of lease contracts are not unusual, we find that the other five factors reinforce that an executed purchase and sale agreement was necessary to form a binding contract. We address these five factors in turn.

First, as the district court noted and Cabot Oil acknowledged at oral argument, representatives from both parties indicated in depositions that formal purchase and sale agreements are customary for these types of lease transactions. Second, a formal contract appears to have been necessary to fully express the parties' agreement. Although the parties'

12

correspondence contained a number of essential terms of an agreement, such as a proposed price term, general information about the leases, and so forth, it left many terms for the parties to negotiate later. Third, the numerous details that the parties still needed to negotiate after their initial correspondence are evidenced by the Proposed Agreement, which spans twelve pages in length and includes a multitude of terms that either conflicted with or were additional to Daugherty Petroleum's August 15, 2008, letter. Fourth, the amount involved in the transaction—over $2,600,000—is large. Finally, the parties' correspondence not only reveals that a final purchase and sale agreement was contemplated as a conclusion to their negotiations, but, as reflected in Daugherty Petroleum's initial proposal, it was a condition to the bid. Because these factors militate in Daugherty Petroleum's favor, Cabot Oil has failed to rebut the presumption that a formal purchase and sale agreement was necessary to form a binding contract.

We therefore agree with the district court that the undisputed facts indicate that the parties merely engaged in preliminary negotiations and there was no mutual assent. From the start, the parties' correspondence reflected that the execution of a mutually agreeable purchase and sale agreement was necessary to consummate their negotiations and would not merely be a convenient memorial of a preexisting agreement.

13

And, furthermore, such a purchase and sale agreement was a condition precedent to the formation of a binding agreement. In the absence of an executed purchase and sale agreement, we agree with the district court that under West Virginia law no binding contract exists between the parties. As a result, Daugherty Petroleum's decision to abandon the negotiations and not to purchase the leases does not constitute a breach of contract.

IV.

We address briefly a few arguments made by Cabot Oil to support its assertion that the district court erred in granting summary judgment.

A.

Relying on our decision in Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir. 1979), Cabot Oil contends that summary judgment was inappropriate because the issue of whether the parties formed a binding agreement was a question for a jury to resolve.

In Charbonnages, we reversed a district court's order that granted summary judgment on the basis that the undisputed facts demonstrated no contract existed between the parties. Id. at 409. In doing so, we acknowledged that "disputes about whether a contract has or has not been formed as the result of words and

14

conduct over a period of time are quintessentially disputes about 'states of mind,'" which typically a trier of fact must resolve. Id. at 414-15. We also recognized, however, that there can "be situations in which the manifestations of intention of both parties . . . not to be bound . . . are so unequivocal as to present no genuine issue of fact." Id. at 415. But, we held, that will rarely be the case in situations in which there are "protracted negotiations involving a 'jumble of letters, telegrams, acts, and spoken words.'" Id. (quoting Restatement (Second) of Contracts § 21A cmt. a (Tentative Draft Nos. 1-7, 1973)). We held that such was the situation presented in Charbonnages and therefore that summary judgment was inappropriate. Id.

Furthermore, in Charbonnages, we recognized that although the parties intended to execute a formal agreement, "[a]n intention to reduce an agreement to writing does not compel the conclusion that this is a condition to the formation of contract" and that "[t]his too depends on the parties' manifested intentions." Id. at 417. We held that the record before the district court prevented resolving this issue as a matter of law. Id. at 417-18.

We disagree with Cabot Oil's contention that Charbonnages precludes summary judgment in this case. Here, unlike in Charbonnages, there are neither protracted negotiations nor a

jumble of communications and conduct. Rather, there are a limited number of e-mails and letters, and the undisputed facts reflect that the parties intended to negotiate a purchase and sale agreement to consummate a binding agreement. West Virginia law presumes no binding contract exists in this situation. Because Cabot Oil failed to offer facts that could rebut this presumption, summary judgment is appropriate.

B.

We next address Cabot Oil's contention that Daugherty Petroleum is estopped from denying the existence of a contract. In so arguing, Cabot Oil employs two different legal principles, neither of which is applicable.

First, Cabot Oil quotes our decision in Stevens v. Howard D. Johnson Co., 181 F.2d 390 (4th Cir. 1950), in which we recognized that "[i]t is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." Id. at 393 (quoting George A. Fuller Co. v. Brown, 15 F.2d 672, 678 (4th Cir. 1926)) (internal quotation marks omitted). This passage reflects the general rule that a party whose duty to perform is conditioned on the occurrence of an event may not in bad faith prevent the occurrence of that

16

condition so as to discharge his duty to perform. See Restatement (Second) of Contracts § 245 & cmt. a (1981). That rule, of course, presumes the existence of a binding agreement that imposes a duty to perform. See id. § 224 cmt. c ("In order for an event to be a condition, it must qualify a duty under an existing contract.").

As described above, such a binding agreement imposing duties to perform does not exist here, so this rule is inapplicable. The execution of a purchase and sale agreement was not a condition on a duty to perform pursuant to a binding contract. Instead, the parties made the negotiation and execution of a mutually agreeable purchase and sale agreement necessary to the consummation of a binding agreement between them. And contrary to Cabot Oil's suggestion, Daugherty Petroleum had no duty to negotiate and execute a binding purchase and sale agreement. As the district court recognized, because the parties were still engaged in preliminary negotiations and no contract existed, Daugherty Petroleum was "at liberty to retire from the bargain" and to decline to enter into a binding agreement. See Virginian Exp. Coal, 131 S.E. at 261 (internal quotation marks omitted).

Second, Cabot Oil cites Ross v. Midelburg, 42 S.E.2d 185 (W. Va. 1947), in support of its argument that Daugherty Petroleum is estoped from denying the existence of a contract.

17

That case, however, recognizes estoppel as an exception to the statute of frauds. Id. at 191-92. Although at the district court Daugherty Petroleum raised statute of frauds as a defense and Cabot Oil asserted estoppel to preclude the applicability of the statute, the district court did not base its ruling on the statute of frauds. Thus, because the statute of frauds is not at issue on appeal, Ross is inapposite.

V.

For these reasons, we affirm the district court's grant of summary judgment.

AFFIRMED

18