Elizabeth S. FITZSIMMONS, Appellant,

v.

Jess S. JACKSON, Appellee.

Jess S. JACKSON,
Appellee/Cross-Appellant,

v.

M. NOLDEN, Successor Trustee to Edward M. Walsh, Trustee, Edward R. Fitzsimmons, Edward M. Walsh, Elizabeth S. Fitzsimmons, Appellant/Cross-Appellee,

and

Ellenora Lynch, Appellee.

Ellenora LYNCH,
Appellee/Cross-Appellant,

v.

Jess S. JACKSON,
Appellant/Cross-Appellee.

Edward M. WALSH, Trustee, Plaintiff,

v.

ST. PAUL TITLE INSURANCE
COMPANY et al., Defendants.

M. NOLDEN, Successor Trustee to
Edward M. Walsh, Trustee,
Appellant,

v.

Jess S. JACKSON, Appellee.

Ellenora C. LYNCH, Appellant,

v.

Jess S. JACKSON, Appellee.

In re Edward R.
FITZSIMMONS, Debtor.

M. NOLDEN, Successor Trustee to Edward M. Walsh, Trustee, Plaintiff,

v.

ST. PAUL TITLE INSURANCE
COMPANY, et al., Defendants.

M. NOLDEN, Successor Trustee to
Edward M. Walsh, Trustee,
Appellant,

v.

Jess S. JACKSON, Appellee.

Edward R. FITZSIMMONS, Appellant,
v.

Jess S. JACKSON, Appellee.

BAP Nos. NC–81–1365–AsEV to NC–81–1367–AsEV, NC–82–1088–AsEV and NC–82–1089–AsEV.

Bankruptcy No. 4–80–02300 H.

Adv. No. 480–0428–AH.

BAP Nos. NC–82–1222–AsEV and NC–82–1341–AsEV.

Bankruptcy No. 4–80–02300 H.

Adv. No. 480–0428–AH.

United States Bankruptcy Appellate Panels
of the Ninth Circuit.

Argued March 25, 1983.

Decided March 22, 1985.

James V. Fitzgerald, III, Watson & Hoffee, Richmond, Cal., Richard M. Heiman, Tonsing & Heiman, Walnut Creek, Cal., R. Donald McNeil, Robert C. Coylar, Caputo, Liccardo, Rossi, Sturges & McNeil, San Jose, Cal., for appellants.

James Dennis, Goth, Dennis & Aaron, A Professional Corp., Redwood City, Cal., Randy Rogers, Murphy, Weir & Butler, San Francisco, Cal., for appellees.

Before ASHLAND, ELLIOTT and VOLINN, Bankruptcy Judges:

## OPINION

ASHLAND, Bankruptcy Judge:

This memorandum covers two consolidated appeals. One is a consolidation of five appeals and cross-appeals. The other is a consolidation of two appeals and cross-appeals. After a jury trial in a condemnation proceeding, one of the successful defendants filed a Chapter 11 petition. The bankruptcy court was called upon to determine the rights of various parties to money remaining in a fund created by the condemnation award.

One of the claimants was the attorney who represented the defendants in the condemnation action. The bankruptcy court awarded him attorneys' fees and held that his award for fees was secured by the interests of the various property owners in the fund. The bankruptcy court issued a lengthy memorandum of decision from

which all parties appeal. We affirm in part and reverse in part.

## JURISDICTION

These appeals were first assigned to the Bankruptcy Appellate Panels pursuant to 28 U.S.C. §§ 1482 and 160 (enacted by the Bankruptcy Reform Act of 1978, P.L. 95–598). These sections are supplanted by 28 U.S.C. § 158 [enacted by the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353, § 104(a) ].

28 U.S.C. § 158 provides for reference of appeals to the bankruptcy appellate panels provided all parties consent, the district judges for the district in which the appeal originates by majority vote authorize such referral, and the judicial council of the circuit establishes a bankruptcy panel. At § 115(b) the Bankruptcy Amendments and Federal Judgeship Act of 1984 also transferred to the district courts appeals pending in the bankruptcy appellate panels on the date of the enactment of the Act.

The Judicial Council of the Ninth Circuit designated bankruptcy appellate panels by an order of August 20, 1984. All district courts in the Ninth Circuit have authorized bankruptcy appellate panels to hear and determine appeals from judgments, orders, and decrees entered by bankruptcy judges in their districts. The Northern District of California where this appeal originated has also referred appeals transferred to it pursuant to § 115(b) of the Bankruptcy Amendments and Federal Judgeship Act of 1984.

All necessary parties to these appeals have consented to the jurisdiction of the panel. This panel has jurisdiction to hear and determine these appeals.

The appeals were argued on March 25, 1983. The delay in resolution of the appeals was caused in part by the time involved in the changes in the law as set forth above, the time to establish the bankruptcy appellate panels, and the time required to obtain the requisite consents.

## STANDARD OF REVIEW

This panel reviews the trial court's findings of fact by the clearly erroneous stan-dard of the Federal Rules of Civil Procedure § 52(a). Rules of Bankruptcy Procedure, Rules 7052 and 8013. The findings are not to be set aside unless clearly erroneous with due regard being given to the opportunity of the trial court to judge the credibility of the witnesses. These rules became effective August 1, 1983. They are similar to Rules 752 and 810 that were effective before that date.

## BACKGROUND

Edward R. Fitzsimmons is an attorney at law. In 1970, he and his wife Elizabeth held an undivided interest in each of two adjacent, undeveloped parcels of land. One parcel was owned concurrently with Elleno-ra and Frank Lynch. The other parcel was owned concurrently with the Melcher family.

The two parcels were located in a section of Northern California which was later designated as The Golden Gate National Recreation Area. The United States National Park Service condemned these parcels pursuant to its authority "to provide for the maintenance of needed recreational open space ..." Pub.L. No. 92–589, § 1, 86 Stat. 1299, (1972). *See United States v. 2.66 Acres of Land,* 426 F.Supp. 533 (N.D. Cal.1977).

The government initiated a condemnation action entitled *United States v. 156.818 Acres of Land,* in the district court for the Northern District of California. Fitzsimmons had provided legal services to the Lynches and Melchers on previous occasions and, therefore, purported to represent the property owners in the condemnation action. He attended the first status hearing in the case on February 18, 1977. A trial date was set for June 20, 1977.

At some point it appears that Fitzsimmons decided not to act as trial attorney in the case. The bankruptcy court concluded that he never intended to act as trial attorney. In January or February of 1977 he began contacting condemnation specialists for the purpose of bringing them into the case as trial counsel. It appears that he did not disclose this fact to the other own-

ers. In March, 1977 he mailed proposed fee agreements to the Lynches and the Melchers. Each agreement provided for the employment of Fitzsimmons as trial counsel and such other attorneys as Fitzsimmons should engage at no additional expense to the clients. The Melchers executed the employment contracts, while the Lynches did not.

On or about May 1, 1977 Fitzsimmons, purporting to act on behalf of all the property owners, engaged the service of Jess Jackson, an attorney who specializes in condemnation practice. The agreement between Fitzsimmons and Jackson is the heart of this dispute. It was generally understood that Jackson was to look to the condemnation award for his fee.

Although his fee arrangement was not finally settled, Jackson represented the owners throughout the litigation and obtained a substantial award for them. The district court jury valued the property as if it had been divided into single family lots. The value was approximately 3.8 million dollars, an amount exceeding $24,000 an acre. The government's highest and last offer prior to trial had been $6,700 an acre. Judgment on the verdict was entered November 9, 1977.

The United States deposited the jury's award with the clerk of the district court on November 17, 1978. That court then undertook to apportion the jury's award among the several owners and various other claimants. Jackson asserted a claim for unpaid attorneys' fees in the amount of $1,320,302.

Upon request of the parties, the district court ordered that the award be deposited with St. Paul Title Insurance Company pending distribution. This was apparently to allow the fund to earn interest while apportionment was pending. Some of the fund was distributed by the title company upon order of the district court.

It appears that by September 1979 the district court had ordered payment of almost all claims against the fund except the claim of Jackson for attorneys' fees. The district court determined that it was with-out jurisdiction to decide Jackson's claim because no federal question was involved. The title company then sought to interplead the remainder of the fund in its possession. It filed a complaint in California Superior Court. Fitzsimmons filed a Chapter 11 petition on July 21, 1980, before St. Paul could deposit the funds with the clerk of that court.

Fitzsimmons initiated an adversary proceeding against the title company seeking a turnover of the remainder of the condemnation award and a determination of his interest in the balance of the money. His trustee in bankruptcy was later substituted as plaintiff. The title company responded by interpleading the money in the bankruptcy court. The remainder of the fund was deposited with the clerk of the bankruptcy court and the bankruptcy court then undertook to determine the rights of the remaining claimants to the balance of the fund.

Meanwhile, Jackson had initiated suit in state court to recover his attorneys' fees. That action was removed to the bankruptcy court and consolidated for trial with Fitzsimmons' adversary proceeding.

### JACKSON'S FEE AGREEMENT

The trial court found that the initial agreement between Jackson and Fitzsimmons provided for a retainer of $200,000 ($100,000 if the case settled before trial) plus a specified percentage of the award in the direct condemnation phase of the case. The agreement also provided that Jackson would receive 50% of any award on inverse condemnation claims. The agreement was conditioned on its being reduced to writing. It appears that Jackson insisted on having a direct fee arrangement with each owner. Fitzsimmons not only accepted this, but agreed to obtain the necessary signatures for Jackson.

Four contracts were drawn up: one for the Melchers; one for the Lynches; and two for the Fitzsimmons' (one regarding each parcel of property). None of these contracts were signed. During the course of the condemnation case, the district court

judge ruled that he would not consider the inverse claims along with the direct condemnation claims. Any inverse claims would have to be asserted in a separate action. Subsequently, Fitzsimmons volunteered to draw up separate contracts for each party regarding the direct and inverse claims. Thus, Fitzsimmons was to obtain signatures for Jackson on eight contracts instead of four.

The bankruptcy court made findings that may be summarized as follows: Fitzsimmons did not obtain the necessary signatures because he had decided, even prior to the ruling regarding the trial of the inverse claims, that Jackson would not receive the 50% of any inverse claims award that he had bargained for. Fitzsimmons had suddenly realized that the potential recovery on the inverse condemnation claims was enormous. He therefore stalled Jackson, telling him that he was having difficulty obtaining the signatures of the owners. In reality, Fitzsimmons knew that Jackson would not act as trial counsel in the direct condemnation action unless he was to receive 50% of the award for inverse claims. Fitzsimmons did not want to lose Jackson as trial counsel, and at the same time wanted to reap Jackson's half of the inverse award for himself.

Only two of the eight contracts were eventually signed. Those were the two Fitzsimmons' contracts regarding the direct condemnation claims only. After the very successful trial in the direct condemnation phase, Fitzsimmons sought to oust Jackson as counsel in the separate inverse actions which Jackson had already initiated for the owners. Fitzsimmons relied on these two contracts as the basis for Jackson's fee, that is, he argued that Jackson had no interest in any recovery for the inverse claims.

The bankruptcy court awarded Jackson attorneys' fees on a *quantum meruit* basis. It concluded that the written agreement between Fitzsimmons and Jackson was unenforceable because it was not reduced entirely to writing and signed by all the parties.

The trial court also held the agreement to be unenforceable because of a fraudulent breach by Fitzsimmons. As a result, Jackson received a greater amount of fees than he would have received if the contract were enforceable. The trial court looked to the customary fee arrangement in condemnation cases of this nature, as well as various other factors in determining Jackson's award. It separately awarded Jackson fees as against each particular property owner. The trial court also found that Jackson was entitled to a lien on the condemnation award fund to secure payment of his fees.

Most of the property owners now appeal the amount of fees awarded to Jackson. Jackson cross-appeals.

## I. The Appeal of the Trustee

The trustee of Fitzsimmons' bankruptcy estate appeals the award of attorneys' fees to Jackson as between Jackson and Fitzsimmons. He raises the following issues:

A. The trustee contends that the trial court erred in finding the contract between Jackson and Fitzsimmons to be unenforceable because it was not reduced entirely to writing and signed by all the parties.

### (1) *Judicial Admissions*

■ The trustee argues that the trial court overstepped its bounds by finding that no contract existed when the pleadings before the court allege the existence of an enforceable contract and seek to recover damages for breach of that contract. The trustee contends that the trial court was bound to accept this "admission" because the existence of a contract was conclusively established by the pleadings.

While it is true that Jackson's pleadings do seek to enforce a contract for attorneys' fees, the pleadings also reflect alternative theories of recovery including *quantum meruit* on a common count and *quantum meruit* based on fraud. The trustee admits that pleading inconsistent and alternative theories of recovery is the accepted practice. *See* Fed.R.Civ.P. 8(e)(2), and *Tan-*

foran v. Tanforan, 173 Cal. 270, 159 P. 709 (1916). It is up to the court to decide which theory of recovery should be sustained. *See Tanforan,* 173 Cal. at 274, 159 P. at 711. The case of *Back v. Hook,* 107 Cal. App.2d 250, 236 P.2d 910 (1951), cited by the trustee is distinguishable because no alternative theory of recovery was pleaded in that case.

The pre-trial statement before the trial court, signed by attorneys for both parties, clearly states that Jackson's claims are based on breach of contract *and* the reasonable value of services rendered (1 ER 122:30–31, 123:1–4, 133:20–24). The trustee relies on the addendum to the pre-trial statement as conclusively establishing that Jackson's claims were limited to breach of contract. His reliance is misplaced. The addendum was filed pursuant to a request in the pre-trial order (1 ER 145:6–11). That request asks for specificty regarding the breach of contract claims *only.* It is not a request that Jackson specify *all* theories under which he is seeking recovery. The addendum (1 ER 147), therefore, speaks only of breach of contract claims because that is all that was requested. The addendum on its face does not purport to limit the theories of recovery in the case.

The trustee also contends that Fitzsimmons "admitted" the existence of a binding contract; therefore, the existence or enforceability of the contract was never an issue. However, the contract whose existence Fitzsimmons "admitted" is not the same contract which Jackson sought to enforce. In his complaint, Jackson alleged the existence of an oral contract. Fitzsimmons *denied* the existence of any oral contract (1 ER 123-9–15). Instead, Fitzsimmons alleged the existence of a written contract. Jackson, seeking to recover under an oral contract, *denied* that the written contract relied upon by Fitzsimmons was enforceable. Jackson alleged that he was fraudulently induced to enter into the written contract. Thus, there was no "admission" by either party of the existence or enforceability of any contract, and the existence of a contract *was* an issue before the trial court. The trial court found the

written contract relied upon by Fitzsimmons to be unenforceable because it did not represent the entire agreement of the parties and also because Fitzsimmons obtained Jackson's signature by fraud.

### (2) *Are the Findings Sufficient?*

■ The trial court found that the oral agreement between Jackson and Fitzsimmons was unenforceable because it was not reduced entirely to writing and signed by all the parties. The trustee argues that, as a matter of law, where all the material terms of a contract have been orally agreed upon, even though it is also the intent of the parties that the agreement be reduced to writing and signed, a binding contract results even though the agreement is never put in writing or signed by any or all of the parties. The trustee contends that such a contract would be unenforceable only in light of a *positive expression* by at least one of the parties that the oral agreement would not be binding until so reduced to writing and signed. He argues that the trial court did not find such a positive expression and, therefore, erred in holding the oral contract to be unenforceable.

Jackson agrees with the trustee's statement of the law, but argues that the trial court *did* find that a signed writing was a condition precedent to the existence of the contract. We agree with Jackson. Although the trial court did state that it did not find an express *agreement* that the contract be reduced to writing, it did find that at least one party, Jackson, treated this as a material condition to his employment (*see* 1 ER 184:22–26, 187:25–29).

■ The trustee next argues that the trial court's finding of a condition precedent is not supported by the evidence. He points to the testimony of Jackson's former law partner, Gughemetti, to show that neither he nor Jackson ever expressed that their oral agreement with Fitzsimmons would not be binding unless reduced to writing and signed by all the parties. However, the portions of the reporter's transcript cited by the trustee do not sup-

port his argument. It is true that in the cited portions there is no mention of such an expression, but that is because the questions to which Gughemetti responded did not specifically address the issue of whether such an intent was expressed. Thus, the portions of the transcript cited by the trustee offer no support.

The trustee also points to the service performed by Jackson prior to preparation of any written fee agreements or their execution by the clients. The trustee argues that Jackson began work on the case about April 30, 1977 and that fee contracts were not sent to the clients until May 10, 1977. He further argues that a multitude of services were performed by Jackson, including the trial of the condemnation case itself, all prior to execution of the fee contracts. The trustee suggests that Jackson's conduct was inconsistent with an intent not to be bound by the oral agreement until it was reduced to writing and signed by all the parties.

We note that a ten-day period between consultation and the submission of fee agreements to the clients was not unreasonable in this case. This was very complex litigation. The trial date was only eight weeks away. There was much to do, and Jackson set out to do it immediately. His performance of services prior to delivery of fee agreements to the clients was not inconsistent with an intent not to be bound until the agreement was reduced to writing, especially in light of the short period of time involved. After that, the agreement *was* reduced to writing. The only thing remaining was to obtain the clients' signatures. The trustee seems to forget that it was Fitzsimmons who was to obtain the signatures, not Jackson. Jackson continued to perform services, relying on Fitzsimmons' promise that signed fee agreements would be forthcoming shortly. The trial court's memorandum of decision reflects ample evidence that Jackson continually tried to have his fee agreement documented throughout his relationship with Fitzsimmons (1 ER 180:16–28). Fitzsimmons continued to stall Jackson, which the trial court found he had a motive for doing.

Thus, Jackson's conduct was not inconsistent with an intent not to be bound until the agreement was reduced to writing. He could not very well cease all preparation of the case.

Contrary to the trustee's argument, the trial court found that: "The evidence is overwhelming ...: Jackson agreed to try the case on condition that he had a direct relationship with all of the owners and Fitzsimmons agreed. The three-part agreement ... was interdependent and *conditional on its being reduced to writing.* Fitzsimmons agreed to obtain the owners' signatures." (1 ER 170:17–22, emphasis added). The trial court's statements are supported by the facts. Jackson was dealing with an agent and wanted to be sure that the principals would be bound. Ownership of the lands was divided and some of the owners were in Thailand. Jackson was looking to the fund for his fee and sought the establishment of liens.

We conclude that the finding of the trial court regarding the existence of a condition precedent is not clearly erroneous. The trial court was in the best position to view the witnesses and the evidence and we defer to its judgment.

### (3) *Waiver—Express and Implied*

█ The trustee argues that, assuming the trial court was correct in its finding regarding a condition precedent to the contract, Jackson waived that condition expressly in certain letters to his clients in which he stated that he would continue to provide services until the contracts were returned signed (1 ER 328:332–340). These letters do not reflect an express waiver of the condition precedent. Indeed, the purpose of the letters was to prompt the clients to comply with the condition precedent. The tone of the letters was patient and understanding. Jackson politely reminded the clients that they had not yet returned the signed contract as promised. He then suggested that returning the signed contracts promptly was also in their best interest. Doing so would help to as-

sure that they would recover attorneys' fees as part of their litigation expenses. Jackson then stated that until the contracts were returned signed he would continue to render services pursuant to the terms and conditions of the written agreement. That statement was not a waiver of the condition precedent. If Jackson were waiving the condition, he would not have requested the clients to return the signed contracts. He was merely assuring the clients that he would continue to perform services on their behalf pursuant to the written agreement, since he was assuming that the clients would promptly sign and return the contracts. It should be noted that Fitzsimmons had represented to Jackson, in the context of the remaining inverse condemnation litigation, that the contracts would be signed. The statute of limitations on these claims was running. Jackson had to act promptly to protect his clients' interests. He could not wait until they returned the contracts before acting (1 ER 179:21–32, 180:1–5). Thus, his performance of services prior to actual execution of the contracts by the clients was in their best interest. He was not waiving the condition precedent.

. ■ The trustee also argues that Jackson waived the condition precedent as a matter of law. He argues that by partly performing under the oral agreement Jackson demonstrated that the requirement of a signed writing was no longer necessary as an essential prerequisite to the existence of a binding contract. The trustee relies heavily on *Paige v. Fullerton Woolen Co.,* 27 Vt. 485 (1854). We do not question the principles stated there and expressed again in *Power Service Corp. v. Joslin,* 175 F.2d 698 (9th Cir.1949). However, the facts in this case are not nearly as similar as the trustee contends. In *Power Service,* the court found that no condition precedent existed. *Id.* at 703. That is contrary to the findings of the trial court here. In *Paige,* the plaintiff made little attempt to document the written agreement that he insisted upon. It was through the plaintiff's own inaction that the condition precedent was not fulfilled and thus waived. In

the case before us, Jackson made continuing attempts to document his fee agreement. He was led to believe that the signed agreements were forthcoming. It was Fitzsimmons who delayed the signing of the contracts, not Jackson. Unlike the plaintiff in *Paige,* Jackson could not very well cease performing services. He was under an ethical obligation to continue preparation of the case and protect his clients' valuable interests. Jackson considered execution of the documents to be a mere "formality" because he was assured by Fitzsimmons that the contracts would be signed, not because he considered their execution to be of little importance. It was the only step remaining to fulfill the condition precedent and bring the contract into existence.

(4) *Was the Condition Precedent Satisfied?*

■ The trustee argues that, assuming the condition precedent was not waived, the trial court erred in finding the condition unfulfilled. He contends that Jackson signed the written contracts and sent them on to the clients for execution. Although the clients did not execute the documents, Jackson performed services on their behalf. The clients knew Jackson was performing those services and accepted the benefits that stemmed therefrom. As such, the clients "accepted" the written contracts, and Jackson received all that he could and did require, that is, a binding written contract embodying all the terms and conditions he wished to include.

The trustee cites a number of cases for the proposition that an agreement in writing that is signed by one party alone, and delivered to and accepted by the other is, when acted upon, a written contract binding upon both parties. Acceptance of the benefits by the non-signing party *is* execution of the written contract. However, the cases cited by the trustee are distinguishable. None of the contracts interpreted in those cases contained an express condition precedent that the contract be signed by all the parties. The trial court in this case did

find such a condition and, as discussed earlier, we have affirmed that finding. In order for a condition precedent to be satisfied, "the assent to its terms must be evidenced in the manner agreed upon or it does not become a binding or completed contract." *Spinney v. Downing*, 108 Cal. 666, 41 P. 797 (1895).

### (5) *Were the Damages Awarded Excessive as a Matter of Law?*

■ The trustee argues that the trial court awarded Jackson three times the fees he would have received had the contract been enforceable. He cites case law to the effect that no person can recover a greater amount in damages for the breach of an obligation than he would have gained by the full performance thereof on both sides. However, the case cited by the trustee presumes the existence of a valid contract and awards damages for breach thereof. In this case, the trial court found, and we affirmed, that no contract existed. The award to Jackson of attorneys' fees was not based on breach of contract, but on *quantum meruit.* Thus, the trustee's argument misses the mark.

B. The trustee contends that the trial court erred in holding the contract between Jackson and the Fitzsimmons' to be unenforceable by reason of a "fraudulent breach."

The trial court's finding regarding Fitzsimmons' "fraudulent breach" was an alternative ground for holding the contract relied upon by Fitzsimmons unenforceable. We need not decide the issues pertaining to the alternative ground because we have already affirmed the ruling of the trial court based on its primary ground, namely, that the written contract was not reduced entirely to writing and signed by all the parties.

C. The trustee further contends that the trial court erred in fixing the reasonable value of Jackson's services.

### (1) *The Direct Condemnation Case*

#### a. *Contingent fee formula*

■ The trustee argues that the trial court's use of a contingent fee formula was

in error. He contends that a contingent fee arrangement is only one of several customary fee arrangements employed in condemnation cases and that the trial court arbitrarily selected it. He argues that the fee contract between Jackson and Fitzsimmons was not contingent except to a relatively small degree, and that a contingent fee formula is not a proper measure of the reasonable value of services rendered by an attorney.

We note: "The rule is established that, in fixing the fees of attorneys, the court is vested with a wide discretion and the court's award of an amount for such fees will be disturbed only when it is manifest that there has been a palable abuse of such discretion." *Los Angeles v. Los Angeles-Inyo Farms Co.*, 134 Cal.App. 268, 274, 25 P.2d 224, 227 (1933).

The trustee cites a few cases that specify factors which may be considered by the court when fixing attorneys' fees. Since a contingent arrangement is not specified as one of the factors, the trustee argues that there is no authority for considering such an arrangement. We disagree. The authorities cited by the trustee do not purport to provide an exclusive list of factors to be considered by the court. Rather, by their very terms, these authorities purport to provide nothing more than general guidelines to assist the court in exercising its broad discretion. *See Los Angeles-Inyo Farms Co.*, 134 Cal.App. at 276, 25 P.2d at 227; *see also* RULES OF PROFESSIONAL CONDUCT Rule 2–107(B). Nothing in these authorities prohibits the use of a contingent fee formula. In fact, Rule 2–107(B), seems to suggest that such a formula should be used.

The trustee next argues that, because the "contract" between Jackson and Fitzsimmons was only contingent to a "very limited degree," the trial court should not have based its award on a wholly contingent formula. This argument presumes that the terms of the contract (which we have already affirmed never came into ex-

istence) are somehow relevant to an award of fees based on *quantum meruit*. We do not think they are relevant. However, assuming for the purpose of argument that the trustee is correct, he misstates the nature of those terms.

The agreement provided for payment of a sum certain to Jackson. That sum, although referred to by the parties as a "retainer," was really a guaranteed minimum fee. Jackson received no money up front. Rather, he was to look to any award for payment of this sum (1 ER 183:11–23). Thus, this "retainer" was little more than a contingency. The findings of the trial court are worth repeating:

> Both Fitzsimmons and Jackson understood, but Gardiner may not have, that Fitzsimmons' "retainer" was not the kind most people think of, i.e. cash up front. Fitzsimmons did not offer a retainer in that sense but a guaranteed minimum, a fixed sum of money *to be paid out of the condemnation award*. So far as raising any sizable amount of cash for a normal retainer, Fitzsimmons was in no better position than the Lynches. As Krystal testified, *everyone knew Fitzsimmons had no money*. Indeed his inability to raise such a retainer precluded serious discussions with one or more of the attorneys Fitzsimmons saw before contacting Jackson.
>
> *Everyone understood* that any fee Jackson would receive *would have to come from the award*, whether it was for services to Fitzsimmons, Melchers or Lynch. (Emphasis added.)

(1 ER 183:11–23). The trustee does not dispute these findings. The portions of the record cited by him are not inconsistent with them. The trustee concedes that the remainder of the agreement was contingent. Thus, in reality, the entire agreement between Jackson and Fitzsimmons was contingent, and the trial court's use of a contingent formula to arrive at reasonable attorneys' fees was not wholly inconsistent with the agreement of the parties.

The trustee next cites several cases for the proposition that the reasonable value of services based on *quantum meruit* should never be based on a contingent contract. However, all of these cases deal with the award of attorneys' fees under a Florida statute allowing for recovery of such fees in insurance contract litigation. Allowance of fees under the statute is considered in the nature of a penalty. *See Travelers Insurance Co. v. Davis*, 411 F.2d 244, 247 (5th Cir.1969). As such, the courts are conservative in their awards since the defaulting party will be required to pay them in addition to other liability. These awards are different than those that might exist between an attorney and his client. *Id.* at 247–248. Thus, these cases are distinguishable from the present case and do not purport to state the general rule. Contrary to the trustee's assertion, the California Supreme Court has not "implicitly recognized" this rule. In *Rader v. Thrasher*, 57 Cal.2d 244, 368 P.2d 360, 18 Cal.Rptr. 736 (1962), the court merely asserted that "a contingent fee contract, since it involves a gamble on the result, may properly provide for a larger compensation than would otherwise be reasonable." *Id.* at 253, 368 P.2d at 365, 18 Cal.Rptr. at 741.

As to the California authority cited by the trustee, even he recognizes that those awards arose in context of the court's inherent equitable powers to provide compensation to attorneys whose services benefitted the public in general or a specific class of persons. *See Serrano v. Priest*, 20 Cal.3d 25, 569 P.2d 1303, 141 Cal.Rptr. 315 (1977). Contrary to the trustee's assertion, the rule stated in those cases has not been extended to cover situations like those in the present case. Contingent fee formulae are frowned upon in such cases because the group of clients is neither completely identifiable nor so large as to make negotiation of fees impossible. None of those problems exist in the case at hand.

We conclude that the trial court did not abuse its discretion by using a contingent fee formula to determine the reasonable value of Jackson's services. The trial court listened to expert testimony and made a determination that a contingent fee was

the usual and customary arrangement in this type of case. The court then considered numerous other factors which militated toward raising and lowering the total fee. The trial court's analysis is set out in its memorandum of decision (1 ER 185–86). The trustee does not challenge the trial court's analysis, except to argue that the actual time expended by Jackson should have been given greater weight. However, the trial court specifically refused to give any weight to this factor, noting:

> The case was taken on the basis of a guaranteed minimum and contingency percentage, neither of which required or contemplated keeping of time records. Accordingly, hours of professional time expended are not completely available. There is evidence that the attorneys worked weekends and, on occasion, until past midnight preparing for and conducting the trial.

(1 ER 186:4–10). The trial court did not weigh the actual time expended because this factor did not add to or subtract from the fee awarded. The court's comments seem to indicate that this would have supported a higher fee had it been considered. In any event, the trial court's reasoning for not weighing this information is supported by the record.

### b. *Post-verdict interest*

■ The trustee takes issue with the trial court's award to Jackson of a percentage of post-verdict interest on the condemnation judgment. The trial court awarded Jackson 35% of the post-verdict delay compensation awarded the owners as a result of the government's delay in paying over the condemnation award. We think the trial court erred in awarding Jackson a percentage of this amount since it represents compensation to the owners for the loss of use of their property between the taking and payment. *United States v. 156.81 Acres of Land,* 671 F.2d 336, 339 (9th Cir.1982). This award had nothing to do with the direct condemnation valuation verdict upon which Jackson's contingency fee was based. Jackson took no part in the recovery of this compensation. Accordingly, we reverse the ruling of the trial court on this issue.

### c. *Exclusion of testimony by experts*

A ruling by a trial judge on admissibility of evidence will not be disturbed on appeal unless there is a clear abuse of discretion. *Pierce Packing Co. v. John Morrell & Co.,* 633 F.2d 1362, 1364 (9th Cir.1980). The abuse of discretion standard provides that the trial court's exercise of discretion should not be disturbed unless there is "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Anderson v. Air West, Inc.,* 542 F.2d 522, 524 (9th Cir. 1976).

■ The trustee contends that the trial court erred in ruling that the information sought was protected by the attorney client privilege. He cites several cases for the proposition that fee arrangements between attorneys and clients are not confidential communications. Even if the trustee is correct, it appears that the trial court's primary reason for excluding this evidence was its irrelevance (RT 835:5–25, 836:1). The court indicated that while it felt that arrangements between Jackson and the witness were relevant to show bias, arrangements between the witness and clients which were referred to him by Jackson were not relevant (RT 839:1–15).

We think the trial court was correct in excluding the evidence based on relevance. Detailed information as to the witness' dealings with his clients would add little. It was already established that the witness had a business relationship with Jackson. The exact amount of dollars gained by the witness through his relationship with Jackson would make little difference. The trial court already had evidence before it regarding possible bias. It made a determination after considering that evidence, and determined that it was unnecessary to intrude into the privacy of specific clients. This was not an abuse of discretion.

### (2) *The Inverse Condemnation Case*

▪ The trustee contends that the trial court erred in awarding Jackson fees for services in connection with the inverse claims. The trial court awarded Jackson $40,000 as to those claims. The trustee contends that Jackson spent little time on the inverse claims and that his work was really just duplication of work already performed in the direct case. He also contends that, based on time records, the award to Jackson is excessive.

The trial court took the trustee's concerns into consideration when making the fee award (1 ER 186:18-32). The actual amount of time spent on the inverse claims militated against a higher award, as did the duplication of work, but there were other factors the trial court considered that supported a higher award. The trial court placed great emphasis on the lack of cooperation Jackson received from the clients and the burdens placed on Jackson by Fitzsimmons. The trial court also considered the many factors it had used in determining the award in the direct condemnation case (*see* 1 ER 185:14-25). We conclude that the award to Jackson for services performed regarding the inverse claims was not clearly erroneous.

▪ D. The trustee also contends that the trial court erred in holding that Jackson was entitled to a lien to secure payment of the award of fees regarding the direct action.

The trustee argues that in California a lien attorneys' fees can be established only by express or implied contract between the attorney and his client. The trustee contends that since the trial court found that no valid contract existed between Jackson and his client, the trial court erred in granting Jackson a lien on the condemnation award to secure payment of his fees. The trustee argues that no lien can be created based on *quantum meruit*, because if the contract falls so does the lien rights granted under it.

The applicable authorities cited by the trustee do not preclude the awarding of a lien in the absence of a valid contract. Those cases happen to involve valid contracts. *See Cetenako v. United California Bank*, 30 Cal.3d 528, 638 P.2d 1299, 179 Cal.Rptr. 902 (1982). The trial court relied on *In re Pacific Far East Lines, Inc.*, 654 F.2d 664 (9th Cir.1981), in which an attorney was discharged by operation of law upon the filing of a bankruptcy petition. The trial court held that, although the attorney was entitled to the reasonable value of his services, he was also entitled to a lien on the recovery since the parties had originally contemplated that he would look to the recovery for his fee. Thus, although a contract originally existed, the attorney was ultimately awarded fees based on *quantum meruit*, and the court held that it should look to the intent of the parties, not the contract, to determine if an attorneys' lien arose. Those facts are very similar to the present case. We conclude that the trial court's award of a lien to Jackson was not clearly erroneous based on *Pacific Far East*.

E. Finally, the trustee contends that the trial court erred in awarding Jackson prejudgment interest.

▪ The trial court awarded Jackson interest of 7% on the direct action award from December 1, 1978 and similar interest on the inverse claims award from March 24, 1978. This award of interest was presumably pursuant to California Civil Code § 3287(b). At any rate, we agree with the trustee that pre-judgment interest may not be awarded where there is no contract and the action lies on *quantum meruit*. "It is well established that where there is no express contract and the action is in *quantum meruit* to recover the reasonable value of services rendered, interest is not recoverable prior to judgment." *Parker v. Maier Brewing Co.*, 180 Cal.App.2d 630, 634, 4 Cal.Rptr. 825, 828 (1960). This stands to reason since pre-judgment interest is not allowed in cases where damages are not certain except by judgment. By its very nature, an award in *quantum meruit* is uncertain until judgment. We, therefore, conclude that the trial court erred in

awarding pre-judgment interest to Jackson and reverse the ruling.

## II. The Appeal of Edward Fitzsimmons

Although a notice of appeal was filed on behalf of Edward Fitzsimmons individually, no briefs were filed on his behalf. Accordingly, this appeal should be dismissed for want of prosecution.

## III. The Appeal of Elizabeth Fitzsimmons

### A. Incorporation of the trustee's arguments by reference.

Elizabeth Fitzsimmons is Edward Fitzsimmons' former wife. The trial court held her to be jointly liable for that portion of Jackson's fee attributable to her former husband. She appeals this holding.

In the first portion of her brief, she incorporates by reference and joins in each argument put forward by the trustee. Accordingly, our discussion of those arguments is applicable here and our conclusions are the same as those reached as to the trustee.

### ▮ B. Mrs. Fitzsimmons contends that she is liable to Jackson only under the written contract.

Elizabeth Fitzsimmons contends that she and her former husband had separated long before the condemnation litigation began. She entrusted responsibility for that litigation to her husband believing that he would act as her attorney in the case. She had no knowledge of his discussions with Jackson or his decision not to try the case himself. It was not until she was approached about signing documents to employ Jackson that she realized her husband would not try the case. She felt Jackson's fees were excessive under the written agreement, but signed the documents at the suggestion of Edward Fitzsimmons. She signed them believing that they reflected the entire agreement with Jackson. As such, she contends she is only liable to Jackson under the agreements. They are the only agreements between Jackson and her. Edward Fitzsimmons was not authorized to engage Jackson on her behalf and she took no part in the initial negotiating or subsequent fraud of Edward. Therefore, she contends that she cannot be jointly liable for Jackson's award as against her former husband.

Jackson argues that it was not necessary that Elizabeth specifically authorize Edward to act on her behalf. He contends that, although they were separated, the condemned property held by Edward and Elizabeth is unquestionably community property. California Civil Code § 5127 gives either spouse management and control of community real property. Edward was managing the real property when he engaged Jackson to defend the condemnation suit. Since Edward's debt to Jackson was incurred during marriage to protect the community property, the debt is considered a "community debt." The property of the community is liable for the contracts of either spouse which are made after marriage. CAL.CIV.CODE § 5116 (West 1983). Thus, Elizabeth Fitzsimmons is liable, to the extent of her interest in the community property, for the debt incurred by Edward to Jackson.

We agree with Jackson. Elizabeth overstates the nature of a separation between marital partners. While it is true that "earnings and accumulations" of a spouse after separation are that spouse's separate property (CAL.CIV.CODE § 5118), separation does not "terminate" all obligations of the marriage as Elizabeth suggests. The fact that a family law court may grant restraining orders in a legal separation to prohibit exercise of control over community property does not help in this case since no such restraining order was ever issued. The ruling of the trial court is affirmed.

## IV. The Appeal of Jess S. Jackson

The trial court found that Jackson did have a direct contractual relationship with Frank Lynch (1 ER 182:16–19). However, the trial court concluded that the Lynch contract should be ignored for two reasons. First, it noted that the Lynch contract differed significantly from the agreement be-

tween Jackson and Fitzsimmons. Second, it held that at most only Mr. Lynch was bound by the contract since Mrs. Lynch did not sign it (1 ER 183:26–32). Jackson now appeals this ruling as clearly erroneous.

A. Jackson contends that the difference in the contracts is not relevant.

■ Jackson argues that the trial court's conclusion that the Lynch contract should be ignored is clearly erroneous since he was free to contract with Lynch without regard to his agreement with Fitzsimmons. We note that, at the outset of their relationship, Fitzsimmons represented to Jackson that he was acting as an agent for all of the landowners, including Lynch. Thus, in Jackson's mind, the terms of his agreement with Fitzsimmons also applied to Lynch.

The trial court was concerned about the different treatment accorded the Lynches. It determined that Mr. Lynch entered into a less favorable deal with Jackson than did Fitzsimmons. Fitzsimmons' justification for presenting the Lynches with a less advantageous contract was that they were unable to pay a retainer because their only source of funds was their interest in the condemned property. Fitzsimmons, however, had no money with which to pay a retainer either, and all parties understood that any fee Jackson would receive would have to come from the award (1 ER 183:11–23).

The trial court found that this was no justification for treating the Lynches differently and held that the Lynch contract should be ignored. If we were to conclude that this finding by the trial court was clearly erroneous, the judgment should nonetheless be sustained for a reason different than the one assigned by the trial court. *L. McBrine Co. v. Silverman*, 121 F.2d 181, 1982 (9th Cir.1941).

The Lynches held their interest in the subject real property in joint tenancy. It is well recognized that "[o]ne joint tenant ... cannot bind his cotenant by any contract which he may make relating to the common property." *Carbine v. Meyer*, 126 Cal. App.2d 386, 392–93, 272 P.2d 849, 854 (1954). Therefore, when Mr. Lynch signed the contract with Jackson, he did not bind Mrs. Lynch to its terms.

■ In the absence of an agreement to the contrary, the proceeds of joint tenancy property retain the same character as the property from which they were acquired. *Taylor v. Crocker-Citizens Nat'l Bank*, 258 Cal.App.2d 682, 65 Cal.Rptr. 771 (1968). The Lynches' interest in the condemnation award stemmed from the condemnation of joint tenancy property and was therefore also held in joint tenancy. When Mr. Lynch died, Mrs. Lynch took the entire interest by right of survivorship.

Earlier in this opinion we held that Jackson was entitled to a lien on the award for his services. To the extent that the contract between Mr. Lynch and Jackson created a lien on the Lynch portion of the award, that lien was extinguished upon the death of Mr. Lynch. Because Mr. Lynch could not bind his cotenant, Mrs. Lynch took the entire interest free and clear of the lien. *See People v. Nogarr*, 164 Cal. App.2d 591, 330 P.2d 858 (1958) (surviving joint tenant took free and clear of a mortgage lien placed on the property by the deceased cotenant).

Mrs. Lynch received the benefits of Jackson's services with regard to the entire joint tenancy property and is liable in *quantum meruit* for the value of those services.

B. The fee-sharing agreement.

■ The trial court determined that Jackson agreed to share with Fitzsimmons a portion of the fees to be received from Lynch. The trial court deemed this agreement to be unenforceable by Fitzsimmons or the trustee as against public policy. However, as between Jackson and Lynch, the trial court took into account that portion of the fee that Jackson was to have paid to Fitzsimmons. Jackson appeals this

deduction as error. Jackson raises four separate arguments.

### (1) *No Meeting of the Minds*

Jackson argues that the trial court erred in finding that he and Fitzsimmons had a fee-sharing agreement. He points to testimony of Fitzsimmons to show that the terms of their agreement were never agreed upon, thus no fee-sharing agreement ever came into existence.

Assuming that Jackson is correct and that no fee-sharing agreement existed, this would have no bearing on the amount owed by Mrs. Lynch to Jackson. The existence of the agreement was but one of a number of factors taken into consideration by the trial court in determining a reasonable fee (*see* 1 ER 185–86).

### (2) *Agreement not Against Public Policy*

We agree with Lynch and the trial court that, if there were a fee-sharing agreement between Jackson and Fitzsimmons, such an agreement would be unenforceable as against public policy. There is no allegation by Jackson that he fully disclosed the fee-sharing agreement to Lynch and obtained consent as required by Rule 2–108 of the Rules of Professional Conduct of the State Bar of California.

### (3) *Fitzsimmons Cannot Collect from Jackson under the Agreement*

Jackson argues that if the agreement is valid, Fitzsimmons should be estopped from collecting under it. We have already agreed with the trial court that if the agreement does exist, it is unenforceable as against public policy.

### (4) *Lynch Should not Get the Benefit of an Unenforceable Fee-Sharing Agreement*

Jackson argues that, if an agreement existed, Lynch was not harmed by it. The Lynch fee was not increased by reason of the Jackson-Fitzsimmons fee-sharing agreement. Thus, Lynch should not benefit by having the shared amount deducted from the amount owing Jackson.

We agree with Lynch that the decision of the trial court to deduct from Jackson's fee was not to benefit Lynch but rather to determine a reasonable fee to Jackson. It appears that Jackson himself considered this a reasonable fee since, presumably, he would have paid the deducted amount to Fitzsimmons anyway as his share of the Lynch fee (1 ER 192:31).

### V. *The Appeal of Ellenora Lynch*

Mrs. Lynch essentially reiterates many of the arguments raised by the trustee in his appeal, all of which we have disposed of above.

### INCOME EARNED ON INTERPLEADED FUND

In appeal No. NC–82–1222 the trustee Edward M. Walsh appeals from orders of the bankruptcy court awarding appellee Jess Jackson a pro rata share of the income earned on the interpleaded fund. Ellenora C. Lynch, in appeal NO. NC–82–1341, appeals on behalf of herself and the estate of her deceased husband as to the same orders. We agree that the appellee is entitled to a pro rata share of the income but disagree as to the date of entitlement.

The factual background for the most part has been discussed earlier in this memorandum. Upon order of the bankruptcy court, the fund delivered by St. Paul was deposited in certificate of deposit accounts bearing high interest. Previously the fund had earned low passbook rates.

On November 23, 1981 the bankruptcy court determined that, as to the condemnation action which produced the fund, Jackson was entitled to recover for legal services rendered and costs advanced and was given a judgment against Fitzsimmons and his trustee in the amount of $433,748 and

the Lynches in the amount of $160,372. The judgment provided for interest at 7% from December 1, 1978.

The judgment also provided that Jackson has a lien on and equitable interest in funds interpleaded against the ownership interest of the Fitzsimmons' in the amount of $491,942.46 and the Lynches in the amount of $181,888.58. These later amounts represented the principal plus interest to October 31, 1980.

In subsequent orders (the orders appealed from) Jackson was awarded a pro rata share of the earnings of the fund from October 31, 1980, the date of its deposit with the clerk of the bankruptcy court, until the date of distribution, in the ratio that his share or lien bore to the total of the fund on October 31, 1980. If Jackson elected to waive a pro rata share he was entitled to 7% interest both before and after the date of interpleader. Jackson chose the pro rata share, which is a greater amount.

The appellants argue that it is unfair to give Jackson interest from December 1, 1978 to October 31, 1980 and then to include the appreciated amount when determining his pro rata share of the fund.

The trial court determined that Jackson's lien arose when the funds were deposited with the district court by the government.

## I. Issue

As stated by the appellant, the issue is whether Jackson should be allowed a pro rata share of the interest earned by an interpleaded fund when he possessed a lien upon the fund to secure payment but had no ownership interest in the fund. We define the issue to be: when did Jackson's interest arise?

## II. Discussion

The court in *Isrin v. Superior Court*, 63 Cal.2d 153, 403 P.2d 728, 45 Cal.Rptr. 320 (1965), held that the intent of the parties

determines the type of claim an attorney may assert against any fund generated due to his efforts. If the parties intended that the attorney look directly to the settlement for payment, then a lien against that settlement is created in the attorney's favor. The lien is inchoate from the date it is created and, upon the production of the fund, the lien attaches to the specific asset. *See In re Pacific Far East Line, Inc.,* 654 F.2d 664 (9th Cir.1981) (where the concept was important because of the priority attributable to the attorney's claims for pre-petition services in a Chapter XI bankruptcy case thus entitling him to immediate payment from the fund).

*Isrin* discusses the concept of attorneys' liens for the purpose of distinguishing the attorney's interest in the fund to be produced from the ownership of a part of a cause of action. The superior court had refused to waive pre-payment of jury fees for an indigent plaintiff in a personal injury case insisting that the plaintiff's attorney, who had a contingent fee arrangement, either finance the litigation or furnish a pauper's oath also. The California Supreme Court held that the attorney had no present pecuniary interest in the subject matter of the suit and that the attorney's contract right to participate in the proceeds of any judgment did not make the attorney a party in interest and thus subject to the same requirements as the plaintiff.

The attorney's lien is an equitable right to have fees and costs due for services in a suit secured by the recovery in the action. The attorney is regarded as an equitable assignee of the judgment to the extent of such services. An attorney's lien, as in the case of any lien, is based on the natural equity that a party should not be allowed to appropriate the whole of a judgment in his favor without paying for the services of the attorney who obtained it. *Isrin*, 63 Cal.2d at 158–59, 403 P.2d at 732, 45 Cal.Rptr. at 324, *quoting from Tracy v. Ringold*, 87 Cal.App. 549, 551, 262 P. 73 (1927).

In this case it is clear that the parties intended that Jackson look to the fund for payment. Although a retainer was requested it was not in the nature of an advance but instead a guaranteed minimum fee to Jackson.

The court in *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), invalidated as an unconstitutional taking a Florida law which gave a county of the state the interest earned on an interpleaded private fund. The fund had been deposited by the purchaser of Webb's assets pursuant to the Florida Bulk Transfer Act. It was property held for the benefit of Webb's creditors. Although no individual creditor had an immediate right to the fund the creditor was held to be entitled to claim a proper share of the interest, "the fruit of the fund's use," realized during the time the fund was held. *Webb's,* 449 U.S. at 161, 101 S.Ct. at 451. "The usual and general rule is that any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal." *Webb's,* 449 U.S. at 162, 101 S.Ct. at 451 [citing numerous cases including *Board of Law Library Trustee v. Lowery,* 67 Cal.App.2d 480, 154 P.2d 719 (1945) ].

The trial court held that the interests of Jackson to the interpleaded funds were absolute as of the date of deposit with the bankruptcy court clerk, subject only to determination by court order or agreement as to amounts and dates of the interests. "Just as the fruit belongs to the owner of the tree, the income belongs to the owners of the interest." (Trial court's memorandum for order of February 19, 1982.)

The "tree" came into existence as to the interests of Jackson and the property owners upon payment of the judgment to the condemnation court by the government. The "fruit" of that "tree" belonged to the owners of the tree then, not later. There is no magic in formally interpleading a fund before the interest of the claimants at-

taches. Moreover, in one sense, the payment to the condemnation court and subsequent payment by its court order to St. Paul was akin to an interpleader. The interest of Jackson in the fund grew or shrank from that date. He shares the benefits of prudent fund management and greater appreciation of the fund as well as the risk of poor management and depreciation of the fund.

The unfairness of awarding Jackson fixed interest on a fixed sum plus the fixed sum and then higher market rate interest on the total is avoided. The fund from the time of its creation could have been deposited to earn higher rates thus benefitting all claimants.

### III. Conclusion

The orders of the trial court should be reversed with instructions to provide in an amended judgment that Jess S. Jackson should share pro rata in interest earned on the fund from November 17, 1978, the date of payment of the condemnation judgment to the district court.

### DISPOSITIONS

#### I. Trustee's appeals Nos. 81–1365 and 81–1366

The award of reasonable fees and the grant of a lien to Jackson are affirmed. The awards of a percentage of post-verdict interest and pre-judgment interest are reversed.

#### II. Edward R. Fitzsimmons' appeal

This appeal is dismissed for want of prosecution.

#### III. Elizabeth Fitzsimmons' appeal No. 81–1367

The award of reasonable fees, the grant of a lien to Jackson, and the determination that she is jointly liable for that portion of Jackson's fee attributable to her former husband are affirmed. The awards of a

percentage of post-verdict interest and pre-judgment interest are reversed.

### IV. Jess S. Jackson's appeal No. 82–1088

The method of determining the fee owed to Jackson by the Lynches is affirmed.

### V. Ellenora Lynch's appeal No. 82–1089

As in the trustee's appeal, the award of reasonable fees and the grant of the lien to Jackson are affirmed, and the awards of pre-judgment interest and post-verdict interest are reversed.

### VI. Trustee's appeal No. 82–1222 and Ellenora Lynch's appeal No. 82–1341

The orders of the trial court are reversed. The trial court should file an amended judgment to allow Jackson to share pro rata in the interpleaded fund from November 17, 1978.